[Civ. No. 818. Third Appellate District.—June 16, 1911.]

CHARLES C. BELDEN, Respondent, v. FARMERS AND MECHANICS' BANK OF HEALDSBURG, a Corporation, and L. C. OLMSTED, Appellants.

LEASE OF FARM FOR HOPS—CONSTRUCTION—PURCHASE OF IMPROVEMENTS AND APPLIANCES BY LESSOR—PAYMENT OF VALUE—INTEREST OF LESSEE—LIENS—ASSIGNMENT.—A lease of farm land requiring the lessees to plant a certain portion thereof to hops, and to "provide all wires, hop-houses and appliances reasonably required," and providing that at the expiration of the lease the lessors would buy the same, and

pay therefor the reasonable value thereof at that time, to be determined by the parties, or by arbitration, if they do not agree, leaves to neither of the lessees any interest in the improvements or appliances as such which can be the subject of a mortgage or attachment lien, but only an assignable interest in the money to be paid by the lessor, the title being vested in the lessor as purchaser by the terms of the lease.

ID.—EFFECT OF ASSIGNMENT TO BANK OF ALL INTEREST OF LESSEE.—An assignment by the lessee to a bank as its creditor of "all the interest of the lessee in and to the improvements placed on said premises under and in pursuance of the terms of the lease" has the effect to transfer to the bank the right of the lessee to be paid for the improvements in future at the expiration of the lease, which is the only right that the lessee could have transferred under such assignment. It was not necessary that the lease should be assigned to the lessor, to effect an assignment of the money to become due under the covenants of the lease.

ID.—VALIDITY OF ASSIGNMENT—VESTED RIGHT TO BE ENJOYED AND DETERMINED IN FUTURE.—It is unimportant to the validity of the assignment, which transferred a vested right to be enjoyed at a specified time in the future, that the extent of the right was not at the time of such transfer determined, but was also to be determined in the future by the method prescribed in the lease.

ID.—ABSENCE OF FRAUD IN BANK—CONSIDERATION—NOTICE OF ASSIGNMENT TO LESSOR—CORROBORATION OF EVIDENCE.—No question having been raised as to the fraud of the bank, its notes against the lessee, past due, were a sufficient consideration for the assignment of the lessee thereto, and the notice of such assignment given by the bank to the lessor before any adverse proceedings were commenced sufficiently corroborated the evidence for the bank as assignee of the rights of the lessee against the lessor.

APPEAL from a judgment of the Superior Court of Sonoma County, and from an order denying a new trial. Emmet Seawell, Judge.

The facts are stated in the opinion of the court.

J. T. Coffman, for Appellants.

James W. Oates, for Respondent.

HART, J.—This action was brought for the purpose of securing a judgment adjudging that certain money, amounting to the sum of $767, and in the possession of the defendant,

Olmsted, is the property of one L. C. Lowrey, and compelling said Olmsted to pay said sum to plaintiff as part satisfaction of a judgment obtained by plaintiff against said Lowrey prior to the institution of this action.

Plaintiff was awarded judgment, from which and the order denying defendants a new trial these appeals are prosecuted.

The facts are: Said Lowrey became, by an assignment from one of the original lessees, the lessee of certain land situated in Sonoma county. Said lease stipulated for the lease of the land to the lessees for a term of five years, beginning with the date of the execution thereof, viz., the twentieth day of February, 1904.

The land so leased embraced about forty acres, and the lessees bound themselves by the covenants of said lease to plant a certain portion thereof in hops. It was further agreed between the parties that the lessees would, for the purpose of carrying on the business of growing hops, "provide all wires, hop-houses, and appliances reasonably required for the cultivation, picking, curing and baling of hops to be raised on said premises during the term of this lease, and to erect such hop-houses in a good and substantial manner." It was further agreed that, at the expiration of five years from the date of said lease, the first parties to the lease (the lessors) would buy all poles, wires, hop-houses and appliances then upon said premises and pay therefor the reasonable value thereof at that time; that "if said parties hereto or their assigns shall not agree as to the reasonable value of said property or any part thereof, at that time, then and in that event the reasonable value thereof shall be determined by three arbitrators, at the equal expense of the parties hereto. . . . "

On the twenty-ninth day of September, 1908, Lowrey, being indebted to the defendant bank in the aggregate sum of $1,075, together with interest, executed an instrument in writing purporting to sell to said bank "all his right, title, interest, estate and expectancy, of, in and to all that certain personal property, to wit, all hop-poles, wires, hop-houses and appliances of every nature and kind used or employed in or about the cultivation, picking, curing and baling of hops and now situated on the lands and premises of L. C. Olmsted . . . , the same being the improvements placed on said premises under and in

pursuance of the terms of a certain lease, dated the twentieth day of February, 1904," etc.

Upon the execution of said instrument by Lowrey and its delivery to the bank, the cashier of the latter addressed a letter to Olmsted notifying him that said bank "was the owner of the Lowrey interest in the property" referred to in said instrument.

On the twentieth day of July, 1909, in an action against Lowrey and his wife, previously instituted in the superior court of Sonoma county, plaintiff was given judgment for the sum of $1,596.25 and $13.80 costs, said judgment having been duly entered against said Lowrey and his wife. In said action a writ of attachment was issued and executed by attaching all debts owing by said defendant, L. C. Olmsted, to said defendants, R. L. Lowrey and wife, and "all personal property and effects in the hands of L. C. Olmsted, . . . and belonging to said defendants, R. L. Lowrey and Mrs. R. L. Lowrey, or either of them, and due return of same made to court."

Olmsted answered the complaint in said action, as he has in this, "stating therein that he had the sum of $767 in his hands belonging to said R. L. Lowrey under a contract with said Lowrey, but that he, said Olmsted, had been notified by the defendant, Farmers and Mechanics' Bank of Healdsburg, that it, said corporation, was the owner of said moneys and demanded that said Olmsted pay the same to said corporation, and that said Olmsted refused to pay over any of said money under said attachment, or to said Farmers and Mechanics' Bank of Healdsburg."

The court found the facts as stated in the foregoing, and further found, in harmony with the cashier's testimony, that the defendant corporation notified Olmsted that it claimed said money, but found that "said claim was and is without merit, and said corporation defendant did not ever, and does not now, own the said money and has no right whatever to the same."

Lowrey's indebtedness to the defendant bank was evidenced by five promissory notes, dated, respectively, November 5, 1906, December 1, 1906, January 15, 1907, June 13, 1907, and July 15, 1907, said notes calling, in the order in which they were dated, for the sums, respectively, of $400, $100, $250, $200 and $125, and each note bearing interest at the rate of

seven per cent per annum. All these notes were due at the time the instrument was executed purporting to transfer to the bank Lowrey's interest in the property or in the money to be paid for the improvements on the land leased to him.

The decision in this case hinges on the nature of Lowrey's "interest," if any, in the improvements made by him on the leased premises and the nature and effect of the transaction by which he purported to transfer such "interest" to the defendant corporation.

Counsel for respondent in his brief deals with the first question upon the assumption that Lowrey owned an interest in or was part owner with Olmsted of the improvements themselves, and upon this assumption argues that, if the instrument ·purporting to transfer Lowrey's interest therein was intended as a bill of sale, it was void as against other creditors of Lowrey because possession of the property so attempted to be transferred was not taken by or delivered to the bank contemporaneously with the execution of said instrument or at all.   The main contention is, however, that, if anything at all, the instrument is a mortgage, and if so intended. the argument proceeds, it was likewise void, so far as other creditors are concerned, because not executed according to the formalities prescribed by section 2957 of the Civil Code, nor recorded, as required by said section.

Manifestly, if Lowrey sought to transfer to the bank an interest in the improvements themselves—the physical property—or intended, by the instrument he executed and delivered to the bank, to mortgage an interest in said improvements, assuming that he had a mortgageable interest therein, the position of counsel could not be impeached.

Lowrey testified that the value of said improvements, whatever it might be determined to be, was, by the assignment, transferred to the bank, to be by it, when collected, applied on his notes.  He further testified that it was understood between him and the bank that, if the money found to be due to him from Olmsted for said improvements proved in amount to be in excess of his indebtedness to the bank, the overplus would be turned over to him.  Upon this testimony the argument is erected that the transaction between the bank and Lowrey as to said improvements amounted to an ineffectual

attempt to burden Lowrey's "interest" therein with the lien of a mortgage.

But we think that it is very clear that Lowrey had no interest in said improvements which could be subjected to the lien of a mortgage. Indeed, an examination of the lease will clearly disclose, in our opinion, that, strictly speaking, he had no interest whatsoever in the improvements themselves.

In the ascertainment of the legal nature and scope and effect of the instrument made and delivered by Lowrey to the bank, said instrument must be examined by the light of the covenants of the lease. And, where the language of an instrument in writing or the facts of a transaction are of a character to leave in some doubt what the parties thereto intended should be the precise nature or the legal effect thereof, and there is, from the nature of the subject matter of such instrument or transaction, but one thing that it can be and have the effect of legally attaining any end, and such instrument or transaction is reasonably capable of a construction that will give to it legal vitality and effect, the rule is that, under such circumstances, the parties thereto must be presumed to have intended that the obligation arising therefrom is one that could be legally effectuated or enforced. In other words, such transaction must not be so construed as to lead to an absurdity or so construed as to render it invalid, if it is reasonably susceptible of a construction that will render it valid or will result in effectuating the manifest intention of the parties.

By the terms of the lease, as we have seen, Lowrey agreed to provide "all poles, wires, hop-houses and appliances reasonably required for the cultivation, picking, curing and baling of hops to be raised on said premises during the term of this lease, and to erect such hop-houses in a good and substantial manner," and that Olmsted agreed to buy the same at the expiration of the term of said lease and pay therefor the reasonable value thereof, at that time, to be appraised by arbitrators to be selected by the parties, in case they themselves were unable to agree upon such value.

We think that there can be no doubt, from this language, that the parties intended that whatever improvements might be found necessary to be made for the stipulated purpose should, upon being erected, become the property of the lessor, and that, therefore, the only right acquired by Lowrey would

be what might be the reasonable value thereof, measured in money, on the date of the expiration of the term prescribed by the lease. In other words, notwithstanding the language is that Olmsted agrees "to *buy* all hop-poles, wires, hop-houses," etc., the lease cannot reasonably be construed to mean that Lowrey was vested with any kind of actual ownership of the physical property itself, but that, by making the improvements called for thereby, he acquired only **a** right to be reimbursed to the extent of the reasonable value of such improvements as appraised and determined either by themselves or by third parties at the time of the termination of the lease. In short, we construe that portion of the lease relating to the improvements to be nothing more, in principle or in effect, than a contract by the terms of which one party engages to erect a building for another on the latter's premises, for which the owner of the property agrees to pay the builder the reasonable value thereof upon the completion of the structure.

That this is the true interpretation of the meaning of that part of the lease is sustained by the fact that there is contained in the instrument no provision that the improvements, portions of which are capable of becoming fixtures, may be removed from the freehold in the event that a satisfactory price could not be agreed upon or, for that matter, for any reason, and, furthermore, by the provision that, in case the parties themselves could not agree upon a reasonable value of the improvements, arbitrators should be selected to perform that office.

By the instrument executed by him to the defendant corporation, Lowrey transferred all his "interest" in and to the *improvements* "placed on said premises *under and in pursuance of the terms of a certain lease*," etc., and, therefore, whatever the nature and extent of such "interest," determinable by the terms of the assignment, as construed by the light of the lease to which it makes reference, such "interest" thereby became the property of said bank. Of course, it will not be contended that Lowrey transferred or pretended to transfer the leasehold. There is no language in the written assignment even remotely indicating such intention. The property conveyed was confined to Lowrey's *interest* in the *improvements*. All, then, that he could have intended to

transfer was either the improvements themselves or the reasonable value thereof, as agreed upon by the parties to the lease, or as appraised by arbitrators appointed for that purpose, and, as it is very clear, as we have seen, that he could not transfer the improvements themselves, or any physical part thereof, it follows, necessarily, that what he did transfer and intended only to transfer was his right to be paid for the reasonable value of said improvements.

The result of the foregoing views is that Lowrey's "interest" in the improvements erected by him on the demised premises constituted a mere "right arising out of an obligation" which was his property and which he had the legal right to transfer. (Civ. Code, sec. 1458.) In other words, it was a chose in action, or a right to recover money by a judicial proceeding (Civ. Code, sec. 953), which may be transferred. (Civ. Code, sec. 954.) It therefore follows that, by the assignment, the bank became the owner of the thing or right, then potentially existing, which had been assigned to it, with full power, of course, to take such steps, when the time was ripe therefor, to reduce it to an actuality. Manifestly, this was all that Lowrey himself could have done with the thing so assigned. It is obvious, from the view we have thus taken of the "interest" acquired by Lowrey in said improvements and assigned by him to the bank, that it follows that it was not only not necessary, but impossible, to put the assignee in the possession of the thing or right assigned. The suggestion of respondent that, to make the sale valid, Lowrey should have delivered possession of the leasehold to the bank with the execution and delivery of the instrument evidencing the sale to the bank proceeds, of course, from the misconceived theory that Lowrey owned an interest in the physical property itself; but we have shown that such theory is not maintainable under the facts as disclosed here. If, however, it is intended by said suggestion to advance the proposition that, in order to have effected a valid *assignment* of the thing which was so assigned possession of the leasehold should also have been assigned, the obvious reply is that, in a legal sense, the effect of that act, so far as was concerned Lowrey's right (the right transferred) to be paid for the improvements, would not have been to transfer to the bank any greater interest in or better title to said right than it has already acquired. Of course, if Lowrey had

so desired, he could have transferred the remainder left of the leasehold, and this, if not restricted by the language of the transfer, would have had the effect of carrying with it all the incidents of the lease as prescribed by the covenants thereof. But, as suggested, this was not at all essential in order to make a valid assignment of any money which would become due him from the lessor, by reason of the covenants of the lease.

Nor, in the determination of the nature of the transaction between Lowrey and the bank, do we attach any importance to the circumstance that the extent of the right thus transferred was not at the time of such transfer determined. Lowrey acquired a vested right, to be enjoyed at a specified time in the future, against Olmsted the moment he completed the erection of the hop-poles, the stringing of the wires and the construction of the hop-houses, etc., and whether such right might, at the time it matured or became enforceable, be determined to be worth one dollar or one thousand dollars, it, nevertheless, existed and, as stated, was vested in Lowrey, and it was such right that he transferred to the bank—nothing less and nothing more. A promissory note is a mere chose in action which may, ordinarily, be sold and transferred, but as well may the validity of a sale or transfer of such an instrument be questioned merely because the security for its payment might become impaired or even worthless and its makers and indorsers, if any, insolvent, and thus the amount, if anything, that could be recovered on it undeterminable until its maturity. The reply to this illustration may be that the note itself, upon its face, discloses the exact sum to become due, whereas such is not the case here; but the illustration will, nevertheless, serve as an apt exemplar of the rule which respondent seems to hope to invoke here and which, if sound, would invalidate not only many and various kinds of assignments of future or contingent interests which would have invariably been upheld by courts of equity, such as the assignment of money to become due employees and servants and the like (not public officers, of course) whose compensation from month to month can be, in many instances, hardly more than approximately estimated or prognostigated, but would render void many assignments of vested interests, to take effect at some future time—for illustration, contracts of the nature of the one here, whose terms

have not been fully completed, or are not to be fully performed until some specified time in the future.

There is no question of fraud raised here by the pleadings or otherwise as to the transaction between Lowrey and the bank. It is not disputed that Lowrey was indebted to the bank in a large sum of money. It is true that the notes evidencing said indebtedness had each passed the date of its maturity, yet they were alive and constituted, as they would even have done if barred by the statute of limitations, a valuable consideration for the assignment. The bank, upon the receipt of the assignment and before the attachment in plaintiff's action against Lowrey was issued and served, notified Olmsted that it had become the owner of the right existing against him and in favor of Lowrey, and this circumstance, in the absence of any charge of fraud, is itself significantly corroborative of the testimony of the bank cashier and Lowrey that the assignment involved an absolute transfer of Lowrey's right against Olmsted.

We think, as our views clearly indicate, that the judgment and order are erroneous and should be reversed.

It is so ordered.

Chipman, P. J., and Burnett, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on August 15, 1911.