[Civ. No. 1778. Fourth Appellate District.—June 19, 1936.]

L. L. WHITE, Respondent, v. CASCADE OIL COMPANY (a Corporation), Appellant.

OIL TOOL EXCHANGE, INC. (a Corporation), Respondent, v. CASCADE OIL COMPANY (a Corporation), Appellant.

Hazlett & Plummer and Robert J. Sullivan for Appellant.

Borton & Petrini and R. Dechter for Respondents.

MUNDO, J., *pro tem.*—On May 25, 1932, appellant Cascade Oil Company entered into a contract in writing with respondent White. This contract was, on July 21, 1932, superseded by a novation which eliminated one of the parties of the first part. No other changes of consequence were made. The contract in part recites: "That whereas, the party of the first part (White) is the owner of, or has under his control, oil and gas mining leases covering a certain five-acre tract of land . . . (description of land) and has arrived at an agreement with said party of the second part (Cascade Oil Company) whereby first party is to assign, or cause to be assigned, to said party of the second part all of the acreage held by said first party . . . in consideration that party of the second part shall employ said party of the first part for an agreed price of $17,500 to drill an oil well on said land.

"Now, therefore, in consideration of the sum of $1.00 . . . and the mutual covenants and agreements between the parties as hereinafter set forth, it is agreed as follows:

"1. Within 10 days from the date of this agreement first party shall . . . deliver . . . to second party proper assignments in writing, assigning to said party certain oil and gas mining leases on the following described lands . . . (same land described).

"2. In consideration of the assignment of the above-described acreage to second party, second party hereby agrees, contracts and engages first party to drill a test well for oil and gas on the acreage so assigned. . . .

"5. In consideration of said services to be performed by first party, second party agrees to pay first party the sum of $17,500 for their services, said sum to be paid at regular intervals as bills for labor and material and all other expenses necessary and incident to the drilling of said well

become due; . . . and it is understood and agreed that second party shall not be obligated to and will not pay to or on account of first party any sum in excess of said $17,500. In the event the costs and expense of the drilling of said well shall exceed $17,500 such excess cost and expense shall be borne by first party.

"Party of the second part further agrees, in consideration of the services to be performed by first party in drilling the said well . . . to execute a good and sufficient assignment of a 10% participating interest in and to said . . . well and to deliver the same upon the commencement of drilling activities, and further agrees that when first party turns over to second party a completed successful producing well it will assign a further 10% interest in and to said well to first party; . . .

"12. . . . that if said well shall not cost the sum of $17,500 that any saving therefrom shall be paid to first party in cash upon the completion of said well . . . "

In accordance with this drilling contract White executed an assignment to appellant conveying all his right, title and interest in and to said lease. White rented equipment from the Oil Tool Exchange, Inc., for which he made an assignment of a 5 per cent participating interest in the well to the Oil Tool Exchange. This 5 per cent was of his 20 per cent participating interest.

On or about October 17, 1932, White completed and placed on production a well upon the leasehold estate. On December 30, 1932, White filed an action against appellant to recover an unpaid balance of the contract price and damages, and the 20 per cent participating interest in the well. On February 11, 1933, respondent Oil Tool Exchange filed an action against appellant for declaratory relief and determination of its 5 per cent participating royalty interest assigned to it by respondent White. The cases were not consolidated but were heard together so that any evidence material in the one case should be considered without the necessity of repetition in the other. Plaintiffs in both cases recovered judgments, White for $3,969.85 and fifteen one per cent participating interests in the well, and Oil Tool Exchange for a five per cent participating interest in the well and $616.35 earned by such interest. From these judg-

ments this appeal is taken. Herein the cases will be referred to as the "White case" and the "Exchange case".

It is contended first in the White case that White had no standing in court and appellant's motions to dismiss and for a judgment of nonsuit should have been granted for the reason that White was not a licensed contractor under the laws of this state. Respondent White admits that he was not a licensed contractor. He contends that it was not necessary that he be licensed for the work performed by him, which he claims was work incidental to the discovery or producing of petroleum, etc., on land leased by him. In this regard he relies upon section 2 of the Amendment of 1931 (Act of June 13, 1929, as amended by the Act of June 3, 1931; Stats. 1929, chap. 791; Gen. Laws 1931, Act 1660) and subdivision (d) thereof which provides that the act shall not apply to " . . . any construction, repair or operation incidental to the discovering or producing of petroleum or gas, or the drilling, testing, abandoning, or other operation of any petroleum or gas well, when performed by an owner or lessee."

Respondent White contends that as a part of the contract he assigned the lease to appellant, but retained by an agreement, in the nature of a reservation, a 20 per cent interest in the production of the well he was to drill. Thus, he says, at the time the contract was made, he was the lessee of the property and at all times subsequent he retained a substantial interest in the lease and was in effect one of the lessees of the property. Upon that ground he submits that he was within the terms of the exception in the act relating to licensing of contractors.

The lease procured by White from the Hassons was for the purpose of exploring and developing the land for the discovery of oil. At the time no well had been drilled upon the property and no discovery of oil had been made thereon. Under the terms of his lease White was required under penalty of forfeiture to enter upon the land and commence within a limited time the drilling of a well for oil or gas and thereafter prosecute the same with diligence until completion. He was an experienced oil well driller and had arranged to obtain the use of the principal tools, implements and appliances required in the drilling of an oil well, but he did not have sufficient funds to complete the necessary

equipment for drilling nor to pay labor employed in such drilling and was unable without assistance to perform the requirements of said lease. Appellant, knowing all these circumstances, entered into the drilling contract with White, whereby White was to furnish such tools, machinery and appliances as are customarily used in the drilling of an oil well, and appellant was to advance from time to time such funds and credit as might be necessary to procure said tools, machinery and equipment. Appellant was to supply such casing and other supplies and materials as are customarily furnished by the owner in the case of a drilling contract. Under the arrangement White was to transfer the lease to appellant. At the conclusion of the drilling and the completion of the well appellant was supposed to determine the amount of money advanced to White, deduct the same from a certain sum and pay the difference in cash to White.

Prior to the agreement with appellant, White had arranged with Wicker Drilling Company to assist him in carrying out the terms of the lease. If this arrangement had been carried out, or if White had had sufficient capital to carry on the operations by himself, there could be no question of his right to do the drilling without the requirement of a contractor's license. But he lacked the means of financing the project; and having called upon appellant for assistance, and having completed his part of the agreement with appellant, appellant would now have him go out of court with nothing, on the ground that he is not a licensed contractor. The inequity of this proposition stands out markedly when we consider that White owned the lease, drilled the well, and turned over to appellant a successful producing well. His work was incidental to the discovery of oil on land leased by him.

It is true that he executed an instrument which purports to be an outright assignment of his interest in the land. For the ascertainment of the legal nature and scope and effect of this instrument, the instrument must be examined by the light of the covenants of the drilling contract. "And, where the language of an instrument in writing or the facts of a transaction are of a character to leave in some doubt what the parties thereto intended should be the precise nature or the legal effect thereof, and there is, from the

nature of the subject matter of such instrument or transaction, but one thing that it can be and have the effect of legally attaining any end, and such instrument or transaction is reasonably capable of a construction that will give to it legal vitality and effect, the rule is that, under such circumstances, the parties thereto must be presumed to have intended that the obligation arising therefrom is one that could be legally effectuated· or enforced. In other words, such transaction must not be so construed as to lead to an absurdity or so construed as to render it invalid, if it is reasonably susceptible of a construction that will render it valid or will result in effectuating the manifest intention of the parties.'' (*Belden* v. *Farmers etc. Bank,* 16 Cal. App. 452, 457 [118 Pac. 449].)

Manifestly the intention here was for White to reserve a 20 per cent interest in the production of the well he was to drill. The assignment of the lease was made in accordance with the provisions of the drilling contract, and, as we say, must be construed in the light of the drilling contract to give effect to the intention of the parties.

The Act of June 13, 1929, as amended by Act of June 3, 1931, pertaining to the licensing of contractors was enacted to protect the public. ''Control over the contractor is given to the state director of professional and vocational standards through the power to revoke licenses for fraudulent and illegal practices.'' (*Alvarado* v. *Davis,* 115 Cal. App. (Supp.) 782 [6 Pac. (2d) 121].) The circumstances attending this case clearly except it from the operation of this act. At the time the contract was made White was the lessee of the property and at all times subsequent he retained rights and obligations under the lease and was in effect one of the lessees of the property. In addition to the reservation of royalty interests in the oil produced he remained obligated under the lease to pay the royalties reserved by the lease to the Hassons. His act in assigning the lease to appellant could not terminate his obligation to the Hassons or relieve him from the liability he assumed when he took the lease from them. If the royalties reserved by the Hassons were not paid by appellant the Hassons could stand upon the terms of this contract made between the lessee (White) and his assignee (appellant) for the lessor's (Hassons') benefit, and sue both parties to recover the royalties

which they had agreed to pay, in the same manner and to the same extent as though both parties were the original obligors under the terms of the lease. (*Lopizich* v. *Salter*, 45 Cal. App. 446 [187 Pac. 1075]; *Pinkerton* v. *Crail*, 113 Cal. App. 484 [298 Pac. 532]; *Samuels* v. *Ottinger*, 169 Cal. 209 [146 Pac. 638, Ann. Cas. 1916E, 830]; *Pittsburg Consolidated Coal Co.* v. *Greenlee et al.*, 164 Pa. St. 549 [30 Atl. 489]; 40 C. J. 1113.)

"Privity of contract, whether between landlord and tenant, or landlord and the assignee of a tenant, cannot be terminated by assignment by the latter, but continues till the end of the term, unless terminated in some legal manner. The fact that the landlord may consent to the assignment, and accept the assignee as a tenant, is immaterial; as is also, the landlord's acceptance of rent from the assignee. The effect of the assignment is to make the assignor a surety to the lessor for the assignee, who, as between himself and the lessor, is the principal, bound while he is assignee to pay the rent and perform the covenants." (15 Cal. Jur. 775.)

Appellant next contends that in the White case the trial court was in error in refusing to allow appellant to show that the intention of the parties, at the time the contract was entered into, was that White was to furnish a "turn-key job". A "turn-key job" was defined in the course of the evidence as being a job wherein the driller of an oil well undertakes to furnish everything and does all of the work required to complete the well, place it on production, and turn it over ready to "turn the key" and start the oil running into the tanks.

Appellant claims that the trial court was most liberal to respondent's counsel in allowing inquiry into the intention of the parties, and that there was no reason why the question of intention should have been opened to one party and not to the other. A review of the record, however, discloses that no evidence was developed by the question objected to by counsel for appellant. Upon objection made and a discussion by the court and counsel the question was withdrawn. Thus it cannot be said that the court opened the question of intention to one party to the disadvantage of the other. The contract by its terms was not a "turn-key" contract as that term is defined in the evidence. In accord-

ance with the drilling contract, White was to assign the lease in consideration of appellant's employment of him to drill a well on the land for a stipulated amount of money. He was engaged to drill a test well for oil and gas; operations were to commence within 15 days from the date of the contract and to continue with due diligence until the well was completed. Appellant was to furnish and install the derrick, and White was to furnish all necessary machinery, equipment, and drilling tools. Upon the commencement of drilling activities, appellant was to execute an assignment of a 10 per cent participating interest in the well, and when White had turned over to appellant a completed successful producing well appellant was to execute a further 10 per cent interest in the well to White. The language of the contract was not ambiguous and therefore the court was correct in holding that it was not susceptible of explanation by oral testimony.

With respect to the Exchange case it is urged by appellant that the trial court abused its discretion in denying appellant's motion for a continuance of this case on the ground that the essential matter in this case is similar to the essential matter in the White case. In other words, it is argued that the Exchange case should have been continued until the judgment in the White case had become final.

When the two cases were called for trial, Mr. Sullivan, on behalf of appellant, stated to the court: ''Based on the opening statement as to what the plaintiff expects to prove in this case, and the contract involved itself, it will become apparent that our motion to continue this matter should be granted. Mr. Borton read from the contract, paragraph four—in our affidavit on file here and in the case of the Oil Tool Exchange against Hasson and others, the foreclosure of the mechanics' lien which is now before Your Honor, and which we offer in support of our motion for continuance, the question there is. whether or not the Cascade Oil Company or Mr. White shall pay for certain drilling equipment which the Oil Tool Exchange alleges was purchased and ordered by White for the Cascade Oil Company. Assuming that Your Honor should give a judgment in favor of Oil Tool Exchange and in this matter he also gave a judgment against the Cascade Oil Company in favor of Mr. White, Your Honor has made us pay a $1530. bill twice.'' The

court assured Mr. Sullivan that he would not do that. After a careful reading of the transcript we have been unable to find wherein any motion was made to continue the Exchange case separate and apart from the White case. It seems, as best as can be determined from the record before us, that the court and counsel were at the time of Mr. Sullivan's statement talking about a motion to continue the White case. The record, however, is considerably confused, and it is difficult to say whether the colloquium involved a motion to continue both cases or not. All cases, including the mechanic's lien case, were before the same judge. The danger, as counsel puts it, of ''being caught upon two judgments'', would not materialize under such a set up. The trial judge, acquainted with all the phases of the several cases before him, was in a position to work out the procedure to the end that the justice of the situation would be subserved. We are satisfied that the trial judge, in the exercise of a proper discretion, considered faithfully and fairly the contentions and rights of the parties and that his denial of the continuance, assuming such a motion was made in the Exchange case, in nowise transgressed appellant's rights.

It is finally urged by appellant that the evidence in the Exchange case is insufficient to support a judgment of any kind in favor of respondent Oil Tool Exchange, and against Cascade Oil Company. It appears from the evidence that on July 9, 1932, White entered into an agreement with respondent Oil Tool Exchange whereby the latter was to rent to White certain oil drilling equipment to be used in drilling the well in question. By the agreement White assigned a 5 per cent interest in and to all oil and gas produced, and he agreed to pay to the Exchange a further consideration of $1,000 in cash. All payments were to be made out of the proceeds from the production. The assignment of this 5 per cent interest was to enable White to fulfill his contract to drill the well.

At the time of the assignment, however, there was no permit of the corporation commissioner in force authorizing the issuance of same. On June 15, 1932, a permit was issued authorizing appellant to transfer to White a 10 per cent participating royalty interest. The certificates evidencing this interest were to be placed in escrow pending further written order of the corporation commissioner. This permit was on

December 7, 1932, revoked, and another permit was issued authorizing an outright assignment to White of 10 per cent royalty interests. On January 6, 1933, White executed an instrument of assignment which referred to the permit of December 7th and the agreement between White and the Exchange. By this instrument White assigned to the Exchange an undivided 5 per cent interest of the 10 per cent authorized to be issued to him by appellant under the permit of December 7, 1932.

Appellant in its opening brief does not touch the permit of December 7, 1932, but labors with its contention that at the time of the first assignment by White on July 9, 1932, appellant could have transferred the White per cents into escrow, but that White, by reason of the restrictions in the permit, could not validly assign the escrowed per cents to another without the consent of the commissioner, which, of course, was not obtained. In its reply brief, appellant concedes that the assignment under these conditions was not void, but merely voidable at the election of the purchaser. But even at that, says appellant, the contract between it and White is "merely a promise on behalf of appellant to execute an assignment to White; and one of the purposes for which White brought this action against appellant was to force appellant to execute an assignment of the royalties claimed by White under the contract; and the trial court so found that appellant had not assigned the royalties claimed by White. Therefore, on January 6, 1933, when White executed his assignment to Oil Tool Exchange, White had nothing to assign and consequently the Oil Tool Exchange could take nothing."

Appellant is in the same position as the issuer of securities. The 10 per cent authorized to be issued to White was in consideration of the transfer of the lease and his services in drilling the well. The 5 per cent claimed by Oil Tool Exchange was issued by White in order to enable him to do the drilling. Appellant has received the benefit of the actual consideration for the 5 per cent royalty interests claimed by the Exchange. In other words, appellant received the total net proceeds of the sale of the per cent. White was the medium through which this result was accomplished. Therefore, to all intents and purposes, appellant occupies the position of the issuer of the per cents

and the Exchange occupies the position of an innocent purchaser thereof. It seems, therefore, that appellant is in no position whatsoever to cause an innocent purchaser to suffer.

It was said in *Eberhard* v. *Pacific Southwest etc. Corp.,* 215 Cal. 226, at 228 [9 Pac. (2d) 302]: ''The inhibitions of the Corporate Securities Act . . . against sales of securities to the public without permits are meant to protect the public from imposition and deception—not primarily to benefit the seller. The seller and the purchaser are therefore in no sense *in pari delicto* where this provision is violated. The fact that the transaction may be void at the behest of the purchaser is not to allow a premium for real wrong done by the seller. The fundamental maxim that 'no one can take advantage of his own wrong' . . . and other kindred principles, immediately recur to the mind.'' Following the doctrine of this case, it was held in *Domestic & Foreign Petroleum Co.* v. *Long,* 4 Cal. (2d) 547 [51 Pac. (2d) 73], that the assignee of a lease is bound by his assignor's sales of percentage interests in the production made in direct violation of the statute. (See, also, *Braunstein* v. *Title Guarantee & Trust Co.,* 216 Cal. 780 [17 Pac. (2d) 104]; *Western Oil & Refining Co.* v. *Venago Oil Corp.,* 218 Cal. 733 [24 Pac. (2d) 971, 88 A. L. R. 1271].)

The 5 per cent interests assigned by White were transferable even though it be conceded that at the time of the assignment there had been no assignment made to him of his per cents. It is established by the evidence that the 5 per cent interest had a potential existence, and in this regard the assignment will be considered as a present contract to take effect and attach as soon as this thing to which the assignment refers has ripened into reality, without the necessity of another act. (3 Cal. Jur. 247, 259, and cases cited.)

Appellant had knowledge of the arrangement whereby White was to rent equipment from the Oil Tool Exchange, and it knew that the Exchange was to receive as part consideration for the rental of the equipment an assignment of a 5 per cent interest in and to the well. Through the joint contribution of White and the Exchange to the development of the well, appellant was enabled to obtain a producing well. If appellant were allowed to defeat the assignment of

the 5 per cent royalty interest claimed by the Exchange on the grounds advanced by appellant an anomalous situation would exist whereby appellant would be enabled to retain the production of the well and thus be shielded by a statute which was enacted for the benefit of purchasers and not primarily to benefit the seller.

Respondent Oil Tool Exchange has asked the court to declare its rights in and to the assignment of the 5 per cent interests in the production of the well, and we are satisfied upon the whole case that the trial court had determined these rights justly and correctly.

The judgments are affirmed.

Barnard, P. J., and Marks, J., concurred.