**CONTINENTAL OIL CO. v. JONES, Collector of Internal Revenue.**

No. 3903.

United States Court of Appeals
Tenth Circuit.

Oct. 31, 1949.
Rehearing Denied Nov. 28, 1949.

Burney Braly, Fort Worth, Tex., for appellant.

Ellis N. Slack, Sp. Asst. to the Atty. Gen. (Theron Lamar Caudle, Asst. Atty. Gen., Lester L. Gibson, Sp. Asst. to the Atty. Gen., and Robert E. Shelton, U. S. Atty., Oklahoma City, Okl., on the brief), for appellee.

Before PHILLIPS, Chief Judge, and HUXMAN and MURRAH, Circuit Judges.

PHILLIPS, Chief Judge.

This action was brought by Group No. 2 Oil Corporation[1] against Jones, as Collector of Internal Revenue, to recover refunds of income taxes paid for the years

1. Hereinafter called the taxpayer.

1940 and 1941 and excess profit taxes paid for the year 1941.

After trial, but before judgment, the taxpayer having merged with Continental Oil Company, the latter was substituted as plaintiff.

From a judgment in favor of Jones, Continental has appealed.

The taxpayer was incorporated on October 22, 1921, under the laws of Delaware. Its entire capital stock was issued to Texon Oil & Land Company,[2] a Delaware corporation, in consideration of which Texon transferred and assigned to the taxpayer certain permits issued by the state of Texas to prospect for and develop oil and natural gas on 16 sections of land situated in Reagan County, Texas, and obligated itself at its own cost and expense to drill and complete for taxpayer a well for oil and gas to a depth of 4,000 feet on one of such sections of land at a location to be agreed upon, referred to as Well No. 1. The cost of the permits to Texon was $1,100.45 and they were transferred to and received by the taxpayer in a nontaxable transaction.

Texon employed Carl G. Cromwell, a drilling contractor, to drill the well. On or about January 25, 1925, Cromwell completed the well. It was a dry hole and was plugged and abandoned upon completion. The cost to the contractor of drilling and completing the well was $50,359.20.

In the year 1924, Texon agreed to drill and equip or cause to be drilled and equipped for the taxpayer two additional wells on the block of leases, at locations to be mutually agreed upon, for which taxpayer agreed to pay $200,000. Texon caused the two additional wells, known as Wells Nos. 2 and 3, to be drilled and completed by Cromwell during the year 1925. In subsequent years, the taxpayer paid Texon the contract price of $200,000. Both wells were completed as dry holes and were plugged and abandoned. The taxpayer recovered salvage materials therefrom of the value of $13,427.38, leaving the net cost to it of Wells Nos. 2 and 3 of $186,-572.62.

The oil and gas permits covering the 16 sections transferred to taxpayer by Texon were converted into oil and gas leases after oil was discovered on other lands included in such permits. The leases were for terms of 10 years, renewable for successive terms of 10 years so long as production continued. Each of the leases was at the end of the original 10-year term renewed for another 10-year term and remained in force and effect until released and surrendered. In 1938, the taxpayer surrendered and wrote off on its books the renewal oil and gas leases, in so far as they covered 5 sections of such lands, which included Section 22, upon which Well No. 1 was drilled. In the year 1940, it surrendered and wrote off on its books the renewal oil and gas leases covering the remaining 11 sections, which included the sections upon which Wells Nos. 2 and 3 were located.

In its tax return for the fiscal year ended June 30, 1925, the taxpayer claimed the cost of drilling the three wells as an expense. The election was made in its first return after the drilling of the wells was completed and the deductions were allowed by the Commissioner under Article 225 of Treasury Regulations 65, then in force and effect.

The taxpayer had no income and did not report income or pay income taxes for the fiscal year ended June 30, 1925.

In its return for the year 1940, the taxpayer deducted the sum of $214,734.92 on account of the leases surrendered in that year. The deduction was based on the cost of Texon of the permits acquired by taxpayer from Texon, plus the net cost of drilling the three wells. The Commissioner allowed a deduction of $687.77 and, in disallowing the remainder, held that the cost of the three wells was a deductible expense in taxpayer's fiscal year ended June 30, 1925. The Commissioner determined the taxpayer had earned a normal taxable income during the year 1940 of $33,648.37 and assessed a deficiency of $7,441.25, which the taxpayer paid, with interest.

2. Hereinafter called Texon.

In its fiscal year ended March 31, 1927, taxpayer received 544 shares of common stock of Reagan County Producing Company, Inc.,[3] of the value of $244.31 per share, which constituted income taxable to it in that fiscal year. It reported such shares as of the value of $1 per share. Because the stock was reported at a value of $1, a net loss of $39,133.97 was shown in the return of income of the taxpayer for the year 1927.

The shares of stock in Reagan had been issued to taxpayer, Big Lake Oil Company, Texon, and Group No. 1 Oil Corporation in connection with an agreement entered into in 1924 with the Marland Oil Company. The stock was placed in escrow when issued, and was to be distributed upon fulfillment of certain conditions. It was distributed in 1927.

No examination was made of the books and records of the taxpayer for the year 1927.

In the year 1928, the Commissioner made an examination of the returns, books, and records of taxpayer's affiliated corporations, Group No. 1 Oil Corporation and Texon. The report by these companies of the receipt of shares of Reagan stock at a nominal value of $1 per share was challenged by the Commissioner and its fair market value on receipt in 1927 was determined to be $244.31 per share.

For the first time, in 1941, the taxpayer disclosed to the Commissioner the error in reporting the Reagan stock for the year 1927. In the year 1941, the taxpayer sold 250 shares of Reagan stock for $3,750 and reported a loss thereon in its income tax return for that year of $57,328.68, arrived at by using the true cost basis of $244.31 per share, or $61,078.68, when, in its return for the year 1927, it had placed the nominal value thereon at $1 per share and arrived at a loss in that year. The Commissioner denied the application and held that the taxpayer's basis for the sale of such shares of stock was zero, and, as a result of the disallowance of the claimed deduction, as-

sessed a normal income deficiency tax of $16,790.09, and, as a result of the disallowance of that item and the disallowance of the taxpayer's deduction for surrendered oil and gas leases in its 1940 return, assessed an excess profits tax deficiency of $9,430.52, which deficiencies, with interest, were paid by the taxpayer.

The taxpayer contends that the contracts for the drilling of the three wells were turnkey contracts. A turnkey contract has a definite meaning in the oil industry. It is a contract where the driller undertakes to furnish everything, and to do all the work required to complete the well, place it on production, and turn it over ready to "turn the key" and start the oil running into the tanks.[4]

The trial court found that the cost of the wells was deductible under Article 225 of Treasury Regulations 65, and that the taxpayer was estopped by its conduct from claiming a loss on the sale of shares of Reagan stock in the year 1941.

The taxpayer contends that the cost of a dry hole drilled under a turnkey contract was not deductible under Article 225. Article 225, in part, reads: "Charges to capital and to expense in the case of oil and gas wells.—Such incidental expenses as are paid for wages, fuel, repairs, hauling, etc., in connection with the exploration of the property, drilling of wells, building of pipe lines, and development of the property may at the option of the taxpayer be deducted as a development expense or charged to the capital account returnable through depletion. * * * The cost of drilling nonproductive wells may at the option of the operator be deducted from gross income as a development expense or charged to capital account returnable through depletion and depreciation as in the case of productive wells. An election once made under this option will control the taxpayer's returns for all subsequent years. * * * "

Later Regulations covering deductions for intangible drilling and development

3. Hereinafter called Reagan.

4. See White v. Cascade Oil Company, 14 Cal.App.2d 695, 58 P.2d 994; Retsal Drilling Co. v. Commissioner, 5 Cir., 127 F.2d 355.

costs and costs of drilling nonproductive wells are set out in marginal Note 5.

It will be observed that Article 225 of Regulations 65 provides for two optional deductions, one for intangible drilling costs, and another for the cost of drilling nonproductive wells.

The two options were tied together for the first time by Regulations 111, § 29.23 (m)—16(b) (iv), applicable to tax years beginning after December 31, 1942, which provided: "If the operator has elected to capitalize intangible drilling and development costs, then an additional option is accorded with respect to intangible drilling and development costs incurred in drilling a nonproductive well." In prior Regulations, the second option was plainly a separate and additional option. Indeed, in

Regulations III, § 29.23(m)—16(a) (ii), the second option is referred to as an additional option.

It is true that the courts, including the Tax Court, have held that intangible drilling costs cannot be allocated and deducted where wells are drilled under turnkey contracts.[6]

The reason for that construction of the first of such options was stated by this court in Grison Oil Corporation v. Commissioner, 10 Cir., 96 F.2d 125, 127, as follows: "Sums which a taxpayer expends for intangible drilling and development costs come within the ambit of the option; not part of the amount paid to a contractor for a completely drilled and fully equipped well. These taxpayers did not make payments to anyone for such costs. In-

---

5. Income Tax Regulations 111, § 29.23 (m) —16, in part, provided:

"Sec. 29.23(m)—16. Charges to Capital and to Expense in Case of Oil and Gas Wells.—(a) Taxable years beginning prior to January 1, 1943.—The provisions of this subsection apply only to taxable years beginning prior to January 1, 1943.

"(1) Items chargeable to capital or to expense at taxpayer's option:

"(i) Option with respect to intangible drilling and development costs in general: All expenditures for wages, fuel, repairs, hauling, supplies, etc., incident to and necessary for the drilling of wells and the preparation of wells for the production of oil or gas, may, at the option of the taxpayer, be deducted from gross income as an expense or charged to capital account. Such expenditures have for convenience been termed intangible drilling and development costs. * * * Drilling and development costs shall not be excepted from the option merely because they are incurred under a contract providing for the drilling of a well to an agreed depth, or depths, at an agreed price per foot or other unit of measurement.

"(ii) Option with respect to cost of nonproductive wells: In addition to the foregoing option the cost of drilling nonproductive wells at the option of the taxpayer may be deducted from gross income for the year in which the taxpayer completes such a well or be charged to capital account returnable through depletion and depreciation as in the case of productive wells.

* * * * * * * *

"(b) Taxable years beginning after December 31, 1942.—The provisions of this subsection apply only to taxable years beginning after December 31, 1942.

"(1) Items chargeable to capital or to expense at taxpayer's option:

"(i) Option with respect to intangible drilling and development costs incurred by an operator (one who holds a working or operating interest in any tract or parcel of land either as a fee owner or under a lease or any other form of contract granting working or operating rights) in the development of oil and gas properties: All expenditures made by an operator for wages, fuel, repairs, hauling, supplies, etc., incident to and necessary for the drilling of wells and the preparation of wells for the production of oil or gas, may, at the option of the operator, be deducted from gross income as an expense or charged to capital account. Such expenditures have for convenience been termed intangible drilling and development costs. They include the cost to operators of any drilling or development work * * * done for them by contractors under any form of contract, including turnkey contracts. * * * *"

6. Grison Oil Corporation v. Commissioner, 10 Cir., 96 F.2d 125, 127; J. K. Hughes Oil Co. v. Bass, 5 Cir., 62 F.2d 176; T. K. Harris Co. v. Commissioner, 6 Cir., 112 F.2d 76, 79; Laster v. Commissioner, 5 Cir., 128 F.2d 4, 5; F. H. E. Oil Co. v. Commissioner, 5 Cir., 147 F.2d 1002; Old Farmers Oil Co. v. Commissioner. 12 B.T.A. 203, 218. See, also, G.C.M. 23034, 1942-1-10947.

stead, one paid its share of the contract price for three completed wells and the other . paid in full the agreed prices for several wells. They cannot trace part of the price paid to a contractor for a capital asset of that kind through his hands and deduct as their ordinary business expense any part of the amount which the contractor paid for intangible drilling and development costs."

And, in denying the deduction of intangible drilling costs of a well drilled under a turnkey contract, in F. H. E. Oil Co. v. Commissioner, 5 Cir., 147 F.2d 1002, 1006, the court was careful to state: "Whether the cost of any unproductive well, after abandoning it and salvaging what is salvable, can be treated as a realized loss is not here in question." And, in Commissioner v. Ambrose, 5 Cir., 127 F.2d 47, 48, the court held intangible drilling costs were deductible where a well was drilled under a cost-plus contract, the court saying: "Under the cost-plus contract here involved, all of the intangible drilling costs were susceptible of identification, calculation, and allocation by the taxpayers, and the expenditures therefor were in fact made by these taxpayers." See, also, Retsal Drilling Co. v. Commissioner, 5 Cir., 127 F.2d 355.

A dry hole is not a capital improvement. It is neither an improvement nor betterment. It results on its completion in an immediate loss of the cost of drilling it.[7]

■ Here, the taxpayer incurred the costs of drilling the three nonproductive wells. No question of identification or allocation of those costs is involved and, under the plain language of the second option in Article 225 of Regulations 65, we are of the opinion that those costs were deductible as a development expense in its return for the year ended June 30, 1925.

■ In its return for the year ended March 31, 1927, the taxpayer stated the value of the 544 shares of Reagan stock, which was income to it in that year, to be $1 per share, whereas, in fact, it was of the value of $244.31 per share. As a result, it avoided a substantial amount of income taxes for that year. If the under-statement of the value of the stock was due to mistake, it was a mistake of fact and not one of law, and the doctrine announced in Commissioner v. American Light & Traction Company, 7 Cir., 125 F.2d 365, and Commissioner v. Saltonstall, 1 Cir., 124 F.2d 110, has no application.

It is true, the Commissioner learned the value of the Reagan stock through his investigation of affiliated companies of the taxpayer, but the Commissioner was only charged with knowledge of the facts reflected in the taxpayer's return or facts he learned from an investigation of that return.[8] To hold otherwise would place an insuperable burden on the Commissioner.

■ Where a taxpayer received property, which constituted income to him, in a particular year and fixed the value of the property in his return for the year at less than its true value, and thereby avoided taxes, when he sells the property in a subsequent year, after the correction of the error in the return for the earlier year is barred by the statute of limitations, he may not fix the basis for determining gain or loss on the sale at its true value and thereby obtain the benefit of a loss on the sale. He may not thus shift his position to his advantage, even though all the technical elements of estoppel are not present.[9]

We conclude that the taxpayer could not fix the cost basis of the Reagan stock sold in the year 1941 at $244.31 in its return for that year, but was bound by the valuation fixed in its return for the year 1927.

The judgment is affirmed.

7. Ramsey v. Commissioner, 10 Cir., 66 F. 2d 316, 318.

8. Bothwell v. Commissioner, 10 Cir., 77 F. 2d 35, 37; Askin & Marine Co. v. Commissioner, 2 Cir., 66 F.2d 776, 778; Angelus Milling Company v. Commissioner, 325 U.S. 293, 299, 65 S.Ct. 1162, 89 L. Ed. 1619.

9. Orange Securities Corp. v. Commissioner, 5 Cir., 131 F.2d 662, 663; Bothwell v. Commissioner, 10 Cir., 77 F.2d 35, 37; Doneghy v. Alexander, 10 Cir., 118 F.2d 521, 524; Alamo Nat. Bank v. Commissioner, 5 Cir., 95 F.2d 622, 623; Commissioner v. Farren, 10 Cir., 82 F.2d 141, 143; Notes, 149 A.L.R. 1150; Notes, 118 A.L.R. 320.