[L. A. No. 19988. In Bank. Feb. 1, 1949.]

ARLINE C. BARHAM, Respondent, v. FRANK F. BARHAM, Appellant.

A. G. Ritter for Appellant.

Walter H. Young for Respondent.

SPENCE, J.—Defendant appeals from those portions of the interlocutory decree of divorce effecting awards of alimony and property in favor of plaintiff. He contends that such awards run counter to a purportedly complete adjustment of all property matters theretofore made by contract, between plaintiff and himself, and that the limitations of such settlement are binding upon the court herein. However, the evidence bearing upon the agreements executed by the parties in the light of their marital history, as well as settled public policy pertinent to the marriage relationship, sustains the trial court's findings in determination of this divorce action, and defendant's points of challenge therefore cannot prevail. Accordingly, the portions of the judgment here subject of appeal must be affirmed.

The record discloses that plaintiff and defendant were first married on October 8, 1928; that plaintiff was granted an interlocutory decree of divorce on August 12, 1940; and that the final decree of divorce in dissolution of the 1928 marriage was entered on January 13, 1942. On May 11, 1945, plaintiff and defendant remarried, neither having contracted a marriage in the meantime. There were no children the issue of either marriage.

On January 21, 1946, plaintiff instituted the present litigation originally as a separate maintenance action and sought a declaration of rights with regard to certain agreements previously executed by the parties: viz., an antenuptial agreement made on October 1, 1928, just prior to their first marriage, and several property agreements dated respectively June 28, 1935, November 16, 1936, December 16, 1936, November 1, 1937, December 2, 1937, and August 24, 1943. Defendant countered with a cross-complaint for divorce on the ground of extreme cruelty. Thereupon plaintiff, with leave of the court, amended her complaint to seek a divorce, alleging extreme cruelty on the part of defendant. At the trial defendant did not oppose a dissolution of the marriage, and he offered

no proof of his charges of cruelty in his cross-complaint. Plaintiff made proof of her allegations of mental cruelty and was awarded a decree of divorce, whereupon the court declared that it would "take up the question of the property rights as joined by the pleadings."

The antenuptial agreement of October 1, 1928, recited that "in anticipation of [their forthcoming] marriage, the parties desire[d] . . . to fix and determine the rights of each of them in any and all property . . ."; and "in consideration of said marriage," each party specifically "waive[d] any and all rights, claims and demands . . . in and to [the] property." of the other, "both during . . . life and after . . . death." The agreement of June 28, 1935, made while the parties were "living separate and apart," was executed "in consideration of the premises and of the mutual covenants" therein "contained and for the purpose of finally adjusting and settling all rights, present or future, including property rights, rights. of second party [the wife] to support and maintenance, and any other rights of whatsoever kind or nature arising out of the marital status of first and second parties, irrespective as to whether there may be a subsequent reconciliation, suit for separate maintenance or divorce." Expressly included in second party's release and waiver were future claims of "interest in community property," "right to . . . homestead," and "any and all claims and rights, present and future, to support . . . saving and excepting such as are provided for by this instrument" ($200 per month to "continue until the death of first party or second party, or until the marriage of second party to another, whichever shall first occur"). Specifically recognizing "the possibility of a future reconciliation," the "parties declare[d] their intention to be that a reconciliation, either temporary or permanent, between first and second parties, or a restoration of the former relations of said parties, or a further separation, temporary or permanent, after any reconciliation" should "not render this agreement or the 'Ante-Nuptial Agreement,' hereinabove ratified, reaffirmed and confirmed, or any provision hereof or thereof, invalid, inoperative, rescinded or revoked," and "particularly agreed" that "the monthly payments . . . to be paid by first party to second party" should "continue as in this agreement provided, notwithstanding resumption of former relations, reconciliations or subsequent separations."

Each of the various property settlement agreements subsequently executed by the parties was denominated "amend-

ment to agreement." The first of these, that of November 16, 1936, increased the "monthly payments" in favor of "second party" to $300 per month "subject to the contingencies" and conditions, however, provided in the "agreement of June 28, 1935." Each of the succeeding amendments ratified and reaffirmed all those preceding it. On August 12, 1940, when plaintiff was awarded her interlocutory decree of divorce with regard to the first marriage, she presented those agreements which had been executed up to that date, which would include the first four amendments, and they were approved by the court in that decree. The last or "fifth amendment to agreement" was that of August 24, 1943, some 19 months after the entry of the final decree of divorce in the first action. It provided that "second party" should "be entitled to a claim against the estate of first party to the extent of" $60,000 "in the event that second party" was "living at the time of the death of first party and [had] not married another," said sum to be payable in monthly payments of $300 "for the support and maintenance of second party." And again "the parties" ratified and reaffirmed "all of the . . . agreements and amendments" theretofore executed and agreed that "the same [should] continue in full force and effect as herein clarified."

In the present action the trial court found that all of the aforementioned agreements, including that of August 24, 1943, "are now and were at all times valid and subsisting and have not been cancelled, rescinded or annulled" but "since the marriage" of the parties "on May 11, 1945 . . . their rights and duties towards each other as husband and wife are controlled by the laws of the State of California and not by the said agreements as to all things occurring since said marriage on May 11, 1945." Accordingly, the interlocutory decree of divorce adjudged the aforesaid agreements to be "in full force and effect and that the plaintiff is entitled to receive from the defendant, by virtue of said agreements, the sum of $300.00 per month . . . [but] that the said agreements are not binding on this court in awarding support to the plaintiff," it being "further adjudged" that "beginning August 1, 1946," and "until the plaintiff remarries," she shall receive "in addition to the moneys required to be paid . . . under the aforementioned agreements" the "sum of $600.00 per month for her support and maintenance," as well as "the community property of the parties acquired after" their second marriage —"May 11, 1945"—amounting to $11,101.01: $6,836.01 in cash, war bonds valued at $3,365, and 100 shares of stock val-

ued at $900. The court also "assign[ed] to the plaintiff, for the remainder of her natural life," a portion of the homestead theretofore declared by her upon defendant's separate property known as the Santa Ynez ranch. It is solely from these last-mentioned portions of the decree—the award to plaintiff of $600 per month for support, the community property, and the homestead—that defendant has appealed.

Plaintiff takes the position that by her second marriage to defendant she acquired new rights with respect to the disposition of property issues between them; that the antenuptial and property settlement agreements theretofore executed between the parties were directed solely to the adjustment of property matters arising as the result of their first marriage, and to subsequent separations and reconciliations in connection with that marriage alone; and that the court therefore properly limited the "binding" effect of the agreements and viewed the parties' remarriage as a new venture calling for an independent determination of their property rights from that point of their resumed marital relationship. On the other hand, defendant maintains that the second marriage of the parties constituted "a reconciliation or a resumption of former relations" as that language appears in the various agreements; that when plaintiff and defendant remarried, no support obligations or property rights arose in conjunction with their renewed marital venture because such matters had already been settled by previous contract between them; and that the trial court's recognition of the validity and subsisting force of the parties' successive agreements precluded an award contrary to the qualifications and limitations thereof. In considering these opposing views, it must be remembered that neither party challenges the trial court's determination that the prior agreements were all valid when made and that as to the matters governed by them, they did not become invalid by reason of the second marriage—and such points of decision now stand final and conclusive. Rather the whole controversy here centers on the interpretation and effect to be given the agreements in the light of the parties' second marriage.

A contract must receive such an interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into effect, if that can be done without violating the intention of the parties. (Civ. Code, §§ 1643, 3541; see Rest., Contracts, § 236(a).) ▪ When the language used is fairly susceptible to one of two constructions, extrinsic evidence may

be considered, not to vary or modify the terms of the agreement but to aid the court in ascertaining the true intent of the parties (*Central Heights Improvement Co.* v. *Memorial Parks, Inc.,* 40 Cal.App.2d 591, 608 [105 P.2d 596]), not to show that "the parties meant something other *than* what they said" but to show "what they meant *by* what they said" (*Barnhart Aircraft, Inc.* v. *Preston,* 212 Cal. 19, 23 [297 P. 20]). ▮ Where any doubt exists as to the purport of the parties' dealings as expressed in the wording of their contract, the court may look to the circumstances surrounding its execution—including the object, nature and subject matter of the agreement (*Wachs* v. *Wachs,* 11 Cal.2d 322, 326 [79 P.2d 1085])—as well as to subsequent acts or declarations of the parties "shedding light upon the question of their mutual intention at the time of contracting" (*Lemm* v. *Stillwater Land & Cattle Co.,* 217 Cal. 474, 481 [19 P.2d 785]). To this latter point, it is said that "a construction given the contract by the acts and conduct of the parties with knowledge of its terms, before any controversy has arisen as to its meaning, is entitled to great weight and will, when reasonable, be adopted and enforced by the court." (*Woodbine* v. *Van Horn,* 29 Cal. 2d 95, 104 [173 P.2d 17]; see, also, 20 Am.Jur. § 1144, p. 998.)

In line with these rules designed to aid the court in the performance of its duty to make "the language used by the parties serve rather than subvert their mutual intention" (*Lemm* v. *Stillwater Land & Cattle Co., supra,* 217 Cal. 474, 481), the following evidence, adduced in the course of plaintiff's direct examination, is pertinent to the issue of the intended scope of the parties' successive agreements, all of which antedated the second marriage and purported to limit plaintiff's rights in defendant's property.

"Q. Now, before you and he were married (the second time) did you have any conversations with Dr. Barham about signing any new written agreements? A. Yes. He wanted me to sign a paper saying that he was to have the entire use of his salary and I wasn't to have anything to say about that . . . And I said no, that I thought we had signed too many agreements already and that marriage was supposed to be trust and fifty-fifty and if it wasn't then I didn't think it was going to be much of a marriage, and so I refused to sign the papers.

"THE COURT: This was before the second marriage? A. Yes.

"BY MR. YOUNG (plaintiff's counsel): Now, did you have any conversation with Dr. Barham about the three hundred

dollars a month that he was paying you at that time? A. Definitely, Mr. Young. He told me that I was to have that for my own personal use, that it wouldn't be touched for anything else.

"Q. Did he tell you that is what the situation would be after the marriage? A. Absolutely. That was a promise.

"Q. Was anything said as to what would be done about the household expenses, prior to your (second) marriage? A. Yes. There had always been trouble about that; I suggested that it would be nice if I could run my own household, because I knew how and am quite capable, and he was to make an allowance for that purpose and pay all utilities and expenses.

"Q. Now, was anything said at that time as to what he would do about the ownership of the Santa Ynez Ranch? A. Yes.

"Q. This was before the (second) marriage? A. Before we were married; if I would marry him he would do thus and so. . . . He would put the place in joint tenancy and if I died before he did it would be left to him and if he died before I did it would be left to me. . . .

"Q. How soon after you and he were married was it that you went to live at Santa Ynez? A. The day we were married."

In corroboration of plaintiff's account as to her dealings with defendant prior to their second marriage, there is this testimony from defendant as given in the course of his deposition, which was introduced in evidence at the trial herein.

"Q. Did you have any conversations with Arline C. Barham immediately prior to marrying her (the second time) regarding the signing of an ante-nuptial agreement? A. Yes . . .

"Q. Now, isn't it a fact, doctor, that shortly before marrying her in May of 1945 you asked Arline C. Barham to sign an ante-nuptial agreement? A. I believe so.

"Q. All right, what did she say to you when you asked her to sign an ante-nuptial agreement in May, 1945? A. She said she had signed so many, she didn't want to sign any more, and I said, 'All right.' . . .

"Q. Well, specifically, did you and Arline Barham have any conversations before your marriage in May of 1945 with respect to the payment to her of $300 a month, which you had been paying her prior to that time? A. I don't remember any specific conversation . . . . Other than to say, of course, that the agreement holds and you are to get your three hundred a month just like you have in the past."

From the foregoing testimony, it may reasonably be inferred that both plaintiff and defendant looked upon their second marriage as a new venture, and that it was undertaken without qualification as to the property rights of either of the parties growing out of their renewed marital relations. In opposing this view, defendant argues the significance of the last amendment—the "fifth amendment"—to the parties' previous agreements, which was executed some 19 months after the final decree of divorce in dissolution of their first marriage. That amendment, like the others, expressly ratified and reaffirmed all the preceding agreements, which would include the language as to their continuing in force "notwithstanding resumption of former relations, reconciliations or subsequent separations." He claims that such wording as *then* ratified cannot reasonably be regarded otherwise than to encompass a second marriage as a "resumption of former relations." But such interpretation overlooks other features of the parties' successive agreements which must be noted. The first agreement—the "Ante-Nuptial Agreement" of October 1, 1928—specifically recited that it was made "in anticipation of" the "marriage" that was "about to be solemnized" and was in "consideration of said marriage," which could only refer to the one of October 8, 1928, and the parties' subsequent ratification of the terms of their preceding agreements appears properly to be confined to that marriage—as the one designated in the course of their successive adjustment of their property rights as husband and wife, as a matter of marital chronology. The last amendment, though executed after the parties' final divorce, does not mention a second marriage or remarriage, nor indicate that the ratification of the wording "resumption of former relations" is to have any different connotation than it had as embraced in the preceding agreements referable to the October 8, 1928, marriage as the only one then contracted between the parties. It is the general rule that in considering marriage settlement agreements, the court must seek the intention of the parties "at the time of [their] execution, for it is their intention at such time that governs." (41 C.J.S. § 102, p. 575; see, also, *Estate of Brimhall,* 62 Cal.App.2d 30, 35 [143 P.2d 981].) Reaffirmance and ratification of agreements will preserve their legal effect but will not change it. Accordingly, under accepted rules of interpretation, a general clause reaffirming the provisions of previous agreements will not operate to enlarge their scope so as to make them applicable to property rights

which they were not intended to govern in the light of the parties' negotiations at the time of their original execution.

Defendant argues that since the last ''reaffirmance and ratification'' was made after the parties' final divorce and included the reference in the former agreements to the resumption of former relations at a time when such procedure would require a new marriage, an inference should be drawn that the previously executed agreements were thereby intended to control the parties' rights in the event of their second marriage. But as opposed to this position, another line of reasoning appears equally sound. ■ A provision in an agreement amending former agreements and reciting that the latter are ratified and reaffirmed expresses an intention of the parties not to raise an objection to the validity of the former agreements nor encroach upon their content except where expressly or by clear implication so modified. However, such ''reaffirmance and ratification'' does not necessarily express a belief of the parties that *all* the provisions of their former agreements are still of practical import, and that none of them has meanwhile become obsolete either by reason of subsequent events or the passage of time. Insistence upon interpretation of a reaffirmance clause as designed to revive the prior agreements with such effect as though they were originally made at the later date would often result in actually changing the meaning of the previously executed agreements when the parties did not so contemplate nor intend to express that purpose in the process of reaffirming their former agreements. Accordingly here, the parties may have considered that all provisions contained in their successive agreements as to reconciliation, made while they were separated but still married, became obsolete upon the dissolution of their marriage. Pursuant to such premise, there would be no reason to dissociate the words ''resumption of former relations'' from the original context and assume that the parties intended such phrase to apply to a new marriage that was not even contemplated when the parties entered into the ''last amendment'' of their property rights, rather than to relate solely to a reconciliation during the period of their existing first marriage. So significant is defendant's admitted act of suggesting before the new marriage that the parties make ''another'' agreement incorporating important provisions of the former agreements and the plaintiff's refusal to so proceed. ■ In the light of such evidence the inference drawn by the trial court with regard to the purport of the parties' intent

as to the scope of their successive agreements and its construction thereof in limiting their application to the first marriage will be deemed conclusive as supported by the record. (*Woodbine* v. *Van Horn, supra*, 29 Cal.2d 95, 104.) ■ Moreover, such determination accords with the rule that marriage settlement agreements must be strictly construed, for "it is a definite doctrine of the law that courts will not enlarge [their] language . . . 'so as to deprive either spouse of such rights unless there is a clear and unmistakable intention to barter them away and to reach such conclusion the contract must not be of doubtful interpretation but must by express terms or by necessary implication, clearly so provide.' (*Girard* v. *Girard*, 29 N.M. 189 [221 P. 801, 35 A.L.R. 1493].)" (*Estate of McNutt*, 36 Cal.App.2d 542, 549 [98 P.2d 253].)

■ Also material to the propriety of the trial court's findings are considerations of public policy, resting on the state's interest in the institution of marriage, which would preclude enforcement of the parties' agreements if construed to govern their rights as projected into a future marital status. There is a vital difference in the public policies applicable to agreements made *before* marriage wherein the prospective husband limits his obligations arising from the marriage relation, whatever violations of marital duties he may commit, and agreements made *after* disruption of the parties' marriage has occurred. "Public policy seeks to foster and protect marriage, to encourage parties to live together, and to prevent separation. (Citing authorities.) But public policy does not discourage divorce where the relations between husband and wife are such that the legitimate objects of matrimony have been utterly destroyed. (Citing authority.)" (*Hill* v. *Hill*, 23 Cal.2d 82, 93 [142 P.2d 417].)

The leading case illustrative of the prevailing policy prohibiting the sanction of a property settlement agreement which interferes with the real substantial status of a marriage contract through alteration of the legal relations of the spouses, to wit, their marital duties and obligations, is *Pereira* v. *Pereira*, 156 Cal. 1 [103 P. 488, 134 Am.St.Rep. 107, 23 L.R.A. N.S. 880]. There the parties had separated and the wife instituted an action for divorce. During its pendency the parties effected a reconciliation and the action was dismissed. The parties then entered into an agreement which provided that "if the husband should thereafter so conduct himself as to give the wife a new cause of action for divorce, and she

should establish the same in a subsequent action against him,'' he ''should thereupon pay to [her] ten thousand dollars,'' in ''full satisfaction, settlement, and discharge of all claims'' for ''alimony'' and ''property'' rights. (156 Cal. 3.) In declaring such agreement to be void as ''plainly against public policy,'' this court stated at pages 4 and 5 as follows: ''The real effect of the contract to pay the ten thousand dollars, so far as the husband is concerned, would be to provide against liability for a contemplated wrong to be subsequently inflicted by him upon his wife, and to liquidate such liability in advance of the commission of the wrong. The evidence and findings show that the defendant was then possessed of property worth about seventy-seven thousand dollars, was engaged in a very lucrative business, and was receiving an income of about eleven thousand dollars a year which he had every reason to believe would continue. By this contract, if valid, he was left free to inflict upon his wife the most grievous marital wrongs, such as would compel her to obtain a divorce, secure in the protection of his contract that ten thousand dollars would satisfy all her claims against him of a pecuniary nature or in relation to the community property. If he should, after its execution, be moved by evil impulse to commit anew the offenses against his wife which first gave her cause for divorce, or other acts having the same legal effect, the existence of a valid contract of this sort could not but encourage him to yield to his baser inclinations, and inflict the injury . . . The law does not countenance such agreements.'' (Cf., Hill v. Hill, supra, 23 Cal.2d 82, 91.)

The same considerations were held to apply in voiding a similar agreement made ''prior to marriage'' in the case of Whiting v. Whiting, 62 Cal.App. 157 [216 P. 92]. Accordingly, a contract providing ''against liability for a contemplated wrong to be subsequently inflicted'' by one of the spouses upon the other and liquidating ''such liability in advance,'' was declared a ''menace to the marriage relation and should not be tolerated, and this irrespective of the time when the same might have been executed in reference to the time of marriage.'' (Ibid, 62 Cal.App. 167; see, also, 17 Am. Jur. § 15, pp. 156-157; annot. of cases, 70 A.L.R. 827; 109 A.L.R. 1174; Vock v. Vock, 365 Ill. 432 [6 N.E.2d 843, 109 A.L.R. 1170].) ▪ So pertinent is the fact here that— with the exception of the antenuptial agreement of October 1, 1928—all the property settlement agreements successively executed by the parties were alike *postnuptial* to the marriage

of October 8, 1928, but *antenuptial* to the marriage of May 11, 1945. If they were construed to apply to the parties' latter marital undertaking, then for offenses committed in connection therewith defendant would be free of all liability as to support or property claims which plaintiff otherwise might make by virtue of the legal relations the parties assumed upon remarriage. But it will not be supposed that the parties entered into agreements contemplating a violation of the law. On the contrary, it will be deemed that they intended a lawful, rather than an unlawful, act, and their agreements will be construed, if possible, as intending something for which they had the power to contract. (6 Cal.Jur. § 168, p. 268; *Long Beach Drug Co.* v. *United Drug Co.*, 13 Cal.2d 158, 166 [88 P.2d 698, 89 P.2d 386] ; *Woodbine* v. *Van Horn, supra,* 29 Cal.2d 95, 104; *Schroeder* v. *Wheeler*, 126 Cal.App. 367, 376 [14 P.2d 903] ; *White* v. *Cascade Oil Co.*, 14 Cal.App.2d 695, 701 [58 P.2d 994].) ▮ In line with these principles, as well as the above-recited evidence indicating the parties' understanding as to the purport of the successive agreements at the respective times of their execution, the trial court properly confined their scope to the first marriage only, and as so limited, adjudged them "valid, subsisting and in full force and effect," entitling "plaintiff . . . to receive" thereby "from . . . defendant" the "sum of $300.00 per month," but that they were "not binding on [the] court in awarding support to . . . plaintiff."

It is undisputed that defendant has regularly made the $300 per month payment to plaintiff ever since it was first incorporated in the parties' property settlement agreements —that of November 16, 1936—covering the period of their several separations and reconciliations, their final decree of divorce, and on through their second marriage, including the time of trial of the present divorce action. Moreover, as heretofore indicated from the parties' respective testimony relative to these payments, defendant always "figured that the three hundred a month was her[s] . . . regardless of anything." ▮ While plaintiff stated at the trial that defendant made such payments to her for her "personal" expenses rather than for "support" (see 6 Cal.Jur. § 226, p. 375), such claim is immaterial insofar as affecting the parties' evident understanding that the monthly payments— regardless of purpose—were intended as an essential feature in the adjustment of their property rights arising from their first marriage. (*Rich* v. *Rich*, 44 Cal.App.2d 526, 529 [112

P.2d 780] ; *Landres* v. *Rosasco*, 62 Cal.App.2d 99, 105 [144 P.2d 20].) Such monthly payments, like the later provision giving plaintiff a claim against defendant's estate "to the extent of" $60,000, payable "$300.00 per month," in the event that she survived defendant and had not married another, appear to be an integral and important element in the parties' amicable liquidation of their rights as confined to their first marital undertaking (*Ettlinger* v. *Ettlinger*, 3 Cal.2d 172, 178 [44 P.2d 540]), with plaintiff agreeing to such provisions *in lieu of* other rights in the community property of the parties (*Adams* v. *Adams*, 29 Cal.2d 621, 625 [177 P.2d 265]). "Highly favored in the law" (*Hill* v. *Hill, supra*, 23 Cal.2d 82, 89) and authorized by the statutes of this state (Civ. Code, §§ 158, 159), such property settlement agreements, when untainted by fraud, coercion, undue influence, or collusion, are valid and binding on the court. (*Adams* v. *Adams, supra*, 29 Cal.2d 621, 624, and cases there cited.) No claim is here made that any of the mentioned vitiating elements ever entered into the parties' extended contractual dealings with each other ; and, to the contrary the agreements expressly state that they were executed "voluntarily and with full knowledge and belief that it [was] for the best interests of each" party to so contract, and "after independent advice of counsel." The parties have continuously acted in accordance with the terms of their agreements as successively modified ; defendant has at all times performed the financial obligations required of him by reason of his contractual undertakings with plaintiff ; and as part of the issues litigated in the first divorce action between the parties, plaintiff presented for examination by the trial court all of the agreements— with the exception of the later executed "fifth amendment"— and secured judicial approval thereof. Consistent with such adjudication, the trial court here found the agreements— including the fifth amendment"—to be "valid and subsisting" and there only remains the question of the propriety of the awards to plaintiff in disposition of the parties' rights upon dissolution of their second marriage. (*Pereira* v. *Pereira, supra*, 156 Cal. 1; *Whiting* v. *Whiting, supra*, 62 Cal.App. 157; see, also, *Seuss* v. *Schukat*, 358 Ill. 27 [192 N.E. 668, 95 A.L.R. 1461].)

Under the terms of the interlocutory decree of divorce herein, the trial court granted plaintiff a support award of $600 per month—not $900 as defendant argues, the extra $300 per month being due to plaintiff under the adjudicated "valid"

property settlement agreements theretofore effected between the parties. At the time such award was fixed by the trial court, the annual income of defendant, as disclosed by his "books and records," was $85,090.57, of which $67,200 was salary. In her affidavit for support, plaintiff stated that her monthly expenses were $830 which included salaries for the gardener and housekeeper employed to take care of the Santa Ynez ranch, the aforementioned homestead property where plaintiff had continued to live.　■　Unquestionably, upon granting the divorce herein to plaintiff, provision of a "suitable allowance" for her support was a matter for the determination of the court "having regard to the circumstances of the parties respectively." (Civ. Code, § 139; see, also, 1 Cal.Jur. § 64, p. 1012; *Puckett* v. *Puckett,* 21 Cal.2d 833, 845 [136 P.2d 1].) Consistent with such recognized discretionary power in the trial court, it cannot be said that the award of a monthly support payment of $600 to plaintiff when defendant, her husband, earned an annual income of $85,000 is excessive. (See *Scheibe* v. *Scheibe,* 57 Cal.App.2d 336, 342-343 [134 P.2d 835].)

■　Nor may defendant successfully attack the community property award to plaintiff. The amount of the community property accumulated during the period of the second marriage was a matter of stipulation by the parties— $11,101.01, consisting of a bank balance of $6,836.01, war bonds having a valuation then of $3,365, and 100 shares of stock valued at $900. The divorce having been granted to plaintiff on the ground of defendant's extreme cruelty, it was within the discretion of the trial court to award her as the innocent spouse all of the community property. (Civ. Code, § 146, subd. 1; *Marshall* v. *Marshall,* 196 Cal. 761, 765 [239 P. 36]; *Crouch* v. *Crouch,* 63 Cal.App.2d 747, 756 [147 P.2d 678]; *Buehler* v. *Buehler,* 73 Cal.App.2d 472, 476 [166 P.2d 608]; *Arnold* v. *Arnold,* 76 Cal.App.2d 877, 883-884 [174 P.2d 674].)

■　Likewise without merit is defendant's claim that the trial court's award of the homestead to plaintiff was improper because it was taken from his separate property, concededly was "worth fifty thousand dollars" and was given to her "for the remainder of her natural life," without regard for the event of her remarriage as a limitation upon her continued use of the property. Section 1238 of the Civil Code specifically provides that a homestead "may be selected from the . . . separate property of the husband." And as stated in *Greenlee* v· *Greenlee,* 7 Cal.2d 579, at page 583 [61

P.2d 1157], where a like objection was raised by the husband in regard to the court's award of homestead property: "Subdivision 4 of section 146 of the Civil Code provides that in divorce actions, if the homestead has been selected from the separate property of either, it shall be assigned to the former owner of such property, subject to the power of the court to assign it for a limited period to the innocent party. . . . The limited period for which the court may assign to the innocent party the homestead selected from the separate property of the other has been held to be for the period of the natural life of the former. (*Strupelle* v. *Strupelle*, 59 Cal.App. 526, 531 [211 P. 248] ; *Neary* v. *Godfrey*, 102 Cal. 338 [36 P. 655] ; *Hutchinson* v. *McNally*, 85 Cal. 619 [24 P. 1071].)'' It is evident that in assigning the homestead to plaintiff here, the trial court was concerned only with the parties to the present divorce action, and it was not bound to consider her possible remarriage as a material factor affecting the propriety of such award. (*Neary* v. *Godfrey,* 102 Cal. 338, 344 [36 P. 655].) Its power to make such award is wholly statutory (*Litt* v. *Litt,* 75 Cal.App.2d 242, 245 [170 P.2d 684]), and there appears to be no limitation on the value of a homestead that may be awarded to the wife as the innocent spouse in a divorce action. ▪ The provision of section 1260 of the Civil Code, restricting the value of a homestead claim to ''not exceeding seven thousand five hundred dollars ($7,500),'' fixes only the extent of exemption of such property ''from execution or forced sale'' (Civ. Code, § 1240), as a limitation enacted solely for the benefit of judgment creditors (*Walton* v. *Walton,* 59 Cal.App·2d 26, 29 [138 P.2d 54]), but has no application in a divorce action. The record discloses without dispute that the homestead property here in question was originally acquired by defendant for plaintiff, and as heretofore stated, they returned there to live on the day of their remarriage, he having promised prior thereto that ''he would put the place in joint tenancy.'' ▪ It is the policy of the law to protect the interest of the wife in homestead property (*Warner* v. *Warner,* 144 Cal. 615, 618 [78 P. 24]) and in view of the circumstances here prevailing, the trial court appears to have been justified in awarding such property to plaintiff as ''the innocent spouse under charges of extreme cruelty.'' (*Litt* v. *Litt, supra,* 75 Cal.App.2d 242, 245.)

▪ As his final point of objection to the trial court's adjudication of the parties' property rights, defendant argues that in making the awards in favor of plaintiff, the court was

unduly influenced and acted to his prejudice because of inadmissible testimony concerning the parties' maintenance of marital relations at various times during the period between their first divorce and their second marriage. As premise for the introduction of such line of testimony, plaintiff's counsel states that it was elicited from her in an attempt "to establish a claim to property accumulated by the defendant between the divorce and remarriage on the principle that their relationship was the same as in the so-called 'putative wife cases.' " However, since the trial court did not award to plaintiff any property accumulated during said period, it cannot be said that the admission of such testimony operated to defendant's prejudice or affected the property assignments in her favor. So pertinent are the trial court's comments in ruling on defendant's motion to strike out such testimony: "I don't think we will strike it at this time. I don't think it will make any particular difference whether it is in the record or not. The farther we go in it the less all of those collateral, small issues seem to matter in the case as a whole." Under such circumstances, the trial court's exercise of its discretion in disposition of the parties' property rights stemming from their second marriage will not be disturbed. (*Cf.*, *Crouch* v. *Crouch, supra,* 63 Cal.App.2d 747, 756.)

The portions of the interlocutory decree of divorce here subject of appeal are affirmed.

Gibson, C. J., Edmonds, J., and Traynor, J., concurred·

SCHAUER, J.—I dissent.

The majority opinion rests on the proposition that "The last amendment, though executed after the parties' final divorce, does not mention a second marriage or remarriage, nor indicate that the ratification of the wording 'resumption of former relations' is to have any different connotation than it had as embraced in the preceding agreements referable to the October 8, 1928, marriage as the only one then contracted between the parties. It is the general rule that in considering marriage settlement agreements, the court must seek the intention of the parties 'at the time of [their] execution, for it is their intention at such time that governs.' [Citations.] *Reaffirmance and ratification of agreements will preserve their legal effect but will not change it.*" (Italics added.)

It appears to me that the conclusion of the court as above

quoted in italics is too narrow. I think, further, that when we "seek the intention of the parties" in respect to a series of agreements we are not bound to relate our inquiry solely to the status of the parties at the date of the original document but rather that we should consider their circumstances as of the respective dates of the several agreements.

The relevant purposes of the antenuptial agreement of October 1, 1928, and of the several amendments thereafter executed, are clearly apparent from the language used. As disclosed in the majority opinion the parties agreed " 'in anticipation of [their forthcoming] marriage, the parties desire[d] . . . to fix and determine the rights of each of them in any and all property . . .'; and 'in consideration of said marriage,' each party specifically 'waive[d] any and all rights, claims and demands . . . in and to [the] property' of the other, 'both during . . . life and after . . . death.' The agreement of June 28, 1935, made while the parties were 'living separate and apart,' was executed 'in consideration of the premises and of the mutual covenants' therein 'contained' . . . Expressly included in second party's release and waiver were future claims of 'interest in community property,' 'right to . . . homestead,' and 'any and all claims and rights, present and future, to support . . . saving and excepting such as are provided for by *this instrument*' . . . Specifically recognizing 'the possibility of a future reconciliation, the parties declare[d] their intention to be that a reconciliation, either temporary or permanent . . . or a *restoration of the former relations of said parties, or a further separation, temporary or permanent, after any reconciliation*' should 'not render this agreement or the "Ante-Nuptial Agreement" . . . or any provision hereof or thereof, invalid, inoperative, rescinded or revoked' . . . Each of the various property settlement agreements subsequently executed by the parties was denominated 'amendment to agreement.' . . . The last or 'fifth amendment to agreement' was that of August 24, 1943, some *nineteen months after the entry of the final decree of divorce in the first action* . . . And again 'the parties' ratified and reaffirmed 'all of the . . . agreements and amendments' theretofore executed and agreed that 'the same [should] continue in full force and effect as herein clarified. ' " (Italics added.)

The significant fact in relation to the last agreement is that by it, for admittedly valid consideration, the parties, *being then divorced,* agreed that the original antenuptial

contract together with the several amendments, should "continue in full force and effect" in the event of a "resumption of former relations." The "former relations" of the parties included those of husband and wife; such "former relations" could be resumed only by remarriage; the republished and redeclared provisions relative to possible *future marriage* could have significance, in their futurity aspects as of that date, only to a remarriage; the parties did remarry and this litigation has ensued.

The majority opinion affirms the trial court in holding that "all of the aforementioned agreements, including that of August 24, 1943, 'are now and were at all times valid and subsisting and have not been cancelled, rescinded or annulled' but 'since the marriage' of the parties 'on May 11, 1945 . . . their rights and duties towards each other . . . are controlled by the laws of the State of California and not by the said agreements as to all things occurring since said marriage on May 11, 1945.' " The decree, among other things, allows the plaintiff the sum of $300 a month provided for by the agreements and in addition awards her "the sum of $600.00 per month for her support and maintenance" until she remarries; it also bestows upon her certain community property and assigns to her "a portion of the homestead theretofore declared by her upon defendant's separate property known as the Santa Ynez ranch."

The effect of the majority opinion is to give to plaintiff all the continuing benefits and to relieve her of all continuing obligations under the several agreements; as to defendant, insofar at least as the agreements are executory, the judgment imposes on him their burdens but deprives him of their benefits.

This holding seems to me to allow the plaintiff "to both eat her cake and have it too." I would reverse the portions of the decree which are the subject of appeal.

Shenk, J., and Carter, J., concurred.

Appellant's petition for a rehearing was denied February 28, 1949. Shenk, J., Carter, J., and Schauer, J., voted for a rehearing.