[Civ. No. 20346. Second Dist., Div. Two. Dec. 28, 1954.]

CLAUDE A. GRIFFITH, Respondent, v. PEARL GRIFFITH, Appellant.

Joseph Scott, J. Howard Ziemann and G. L. McFarland for Appellant.

Ball, Hunt & Hart for Respondent.

McCOMB, J.—This is an appeal from an interlocutory decree of divorce, granted to plaintiff on the grounds of extreme cruelty, wherein the community property was awarded to plaintiff.

*Facts*: Plaintiff and defendant were married on January 15, 1921, and lived together until September 11, 1940. On September 20, 1940, plaintiff filed a complaint against defendant for divorce, to which defendant filed an answer and cross-complaint for separate maintenance. After a contested trial plaintiff was denied a divorce and defendant was granted a decree of separate maintenance on May 2, 1941. This judgment became final.

On May 15, 1952, plaintiff instituted the present action for divorce, alleging extreme cruelty. After trial an interlocutory decree was awarded to plaintiff on the grounds of extreme cruelty and the community property of the parties was awarded to him.

■ *Questions*: First: *Was there substantial evidence to sustain the material findings of the trial court?*

*Yes.* The trial court found: (a) "On one occasion, when plaintiff had loaned his car to defendant while he and his brother, Orville, had dinner, and spent the evening together, when plaintiff requested the return of his automobile, defendant refused to give it to him, cursed at him, threw the car keys away, and pushed the car down an inclining driveway, causing considerable damage to said car . . ."

The foregoing finding was supported by plaintiff's testimony as follows: "A. Alone. So I told her being as we were going to go, I would leave her my car to drive, my wife and my sister-in-law, could use the car. So we did. So we came back the next morning to pick up my car. She refused to let me have the car."

"Q. What was said by her? A. She says, 'Well, you dirty son of a bitch, you are not going to get it,' and threw the keys away."

"Q. Who did that car belong to? A. It belonged to me and the finance company. . . . Then she pushed the car out

of the garage and let it run across on the incline down and caved in the back end of the car on a telephone pole. It bounced across the street a couple of times and hit that post.''

''Q. Did you say anything to her about that or have any argument? A. No, I did not.''

''Q. Did anything else happen at that time? A. I found the keys, got in the car and drove off.''

This testimony was fully corroborated by his brother, Orville.

The trial court found (b) ''Within one year after May 2, 1941, defendant came to the apartment on Long Beach Boulevard in South Gate, where plaintiff was living, beat upon the window, and talked in a loud, boisterous manner causing plaintiff's landlady to request him to move, which he did.''

The foregoing finding was supported by plaintiff's testimony as follows: ''Q. What happened? A. She came up there between 12:00 and 1:00 o'clock at night, rapping and hammering on the door and was mad because my sister come up to stay with me.

''Q. Did she say anything to you? A. I didn't talk to her. She talked to my sister through the window and I saw her there. I was in the room there. I got up from the other room and come in where my sister was.

''Q. How long was she there during this time, do you think, Mr. Griffith. A. I would say ten or fifteen minutes.

''Q. Were there any results or consequences of this? A. The consequence was that my sister went and had to go home and go down and stay with her. Then the landlady forced me to move because she would come there in the middle of the night and disturb the place. . . .

''Q. The Court: What was the disturbance? You have not described any yet.

''The Witness: Well, disturbing, that she would come there and knock on the door and calling at 12:00 or 1:00 o'clock, in the middle of the night.

''Mr. Hart: What did she say? What was the tone of her voice? A. The tone of her voice was that she was mad because I had taken my sister and said that I was trying to keep her away from visiting with her.''

The trial court also found: (c) ''On a second occasion, when plaintiff was living in an apartment at Compton, defendant followed the practice of parking in front of plain-

tiff's house for no apparent reason, until his landlady requested plaintiff to leave.''

The above finding is supported by the following testimony of plaintiff: ''The Witness: The summer of 1943 and fall of 1943. She was parking out across the street there watching the house continually all the time. . . .

''Mr. Hart: You saw her out there several times? A. That is right.

''The Court: How many times?

''The Witness: Well, I would say a half dozen times, at least.

''Mr. Hart: Any consequences of that, anything happen because of her being out there? A. Well, the landlady told me I would have to move.

''Q. Did she tell you why you would have to move? A. She said she wasn't going to have somebody watching her place. . . .

''The Court: Just tell us what happened next.

''The Witness: She did the same thing there. She drove out there.

''The Court: When was that?

''The Witness: And watching the place. . . .

''The Witness: That is in Compton.

''Mr. Hart: How many times did it occur over there? A. Well I know of three different times.

''Q. What times of day would she be out there? A. It would be along 8:00, 9:00 o'clock at night.

''Q. Did she ever explain to you what her purpose was? A. No. I didn't go up and talk to her.''

The court found: (d) ''When defendant purchased the home, which was badly in need of repairs and work, and where gophers had thrown up large amounts of dirt underneath the house, which impaired ventilation and heating system, plaintiff did voluntarily offer and did spend many weeks during an entire year cleaning out under the house, painting it, building shelves in the garage, and other general manual labor in and about said home; on each occasion when he was working, defendant complained about how he did each job, berated him, swore at him and acted generally in a manner inconsistent with one receiving free voluntary work.''

The foregoing finding is supported by this testimony of plaintiff:

''Q. At any time did you ever go over to her place to do any work or anything like that? A. Lots of times.

"Q. Did anything happen on those occasions? A. Yes.

"Q. On the first time you went over there, what did you go over there to do, after May 2, 1941? A. I went over to mow her lawn and clean up her yard.

"Q. What happened when you went over? . . .

"A. Nothing, only just led to a fuss every time that I would do those things.

"Q. What did she say to you? A. She would always want to know, 'What you're doing.' 'What you're doing with your money.' 'Where you've been.'

"Q. Did she thank you for coming over and mowing the lawn? A. No, she didn't.

"Q. Were you charging her for this work? A. I certainly was not.

"Q. I am interested in acts, times when you went over there when some acts were done. A. 1944, either the fall of 1944 or 1945, she bought a house in the next block down there. I worked for two days digging the dirt.

"Q. You went down there. What did you go down there for? A. I went down there to do the work for her.

"Q. How did you know about the work? A. Because I went over by there to see her.

"Q. What work needed to be done? A. Yes.

"Q. What work needed to be done? A. It needed to be painted and it needed to be—the gophers had dug up under it. It was packed solid under the house.

"The Court: What did you do?

"The Witness: I had to dig out under the foundation and go up under the house to dig this dirt out.

"Mr. Hart: You were over there for how long a period of time, then? A. It had taken me about two days for this. Then I painted the inside of all the bedrooms, the hall and the kitchen for her.

"The Court: What is there about that episode that you claim is cruelty?

"The Witness: The cruelty is after you get through, I have never—I never did it right. It was always wrong. I never got it done right.

"The Court: You mean she complained that you were not doing it right?

"The Witness: She complained that I wasn't doing the job right and also that I—after I got finished on that job, she told me I was just around nosing around in her business.

"Mr. Hart: Was there any charge made? A. No, sir.

"Q. It was not a business engagement but voluntary work on your part? A. Voluntary work on my part.

"Q. You were over how long during the painting and the under-the-house work? A. I was over there about a week. That is, in spare time.

"Q. How many times when you were over there was this fuss or conversation or complaint made? A. Well, there was some days I was over there and she wasn't there because she was in the real estate business. Then she wouldn't get down there . She was on the other days there.

"Q. How many times did it happen over this time? A. I would say four or five times in that length of time. . . .

"Mr. Hart: I will lay a foundation. You went over there to put in a sprinkler system? A. No, I didn't put it in, it was already in.

"Q. Who asked you to come over to do something about it? A. Nobody, I just dropped by there. She said she was working on it, said it wasn't working. I took the heads all out. She was mad because I wouldn't buy new ones.

"The Court: Do not put it that way. Tell us what she said and what you said.

"The Witness: She says: 'If you was doing it for somebody else, you could go buy new ones.' .

"Mr. Hart: What else did she say or do? A. I left.

"Q. You did not finish that job? A. I got the heads back on and left."

In addition, the trial court found: "It is further true that the above course of conduct of defendant toward plaintiff caused him great and grievous mental suffering, mental anguish, and impaired his health, and that because of said course of conduct by defendant toward plaintiff, plaintiff's love and affection for defendant has been totally destroyed." This finding was in conformity with the testimony of plaintiff.

In view of the above findings, which are supported by the evidence, which in turn support the interlocutory decree of divorce, no useful purpose would be served in detailing other evidence of acts of cruelty offered by plaintiff. We of course must disregard contrary testimony of defendant. ■ The applicable rule of law is found in *Keener* v. *Keener,* 18 Cal. 2d 445, 447 [116 P.2d 1], where it is said: "In each case the infliction of 'grievous mental suffering' is a question of fact to be deduced from the circumstances of the case, in the light of the intelligence, refinement and delicacy of sentiment of the complaining party. . . . A correct decision

must depend upon the sound sense and judgment of the trial court. Its conclusion will not be disturbed unless the evidence is so slight as to indicate an abuse of discretion.''

The sufficiency of the corroborative testimony, as in the present case, lies in the sound discretion of the trial court. (*Kirsch* v. *Kirsch,* 119 Cal.App.2d 271, 275 [259 P.2d 444].) It is likewise settled that it is unnecessary that all of plaintiff's testimony be corroborated. (*Price* v. *Price,* 71 Cal.App.2d 734, 736 [163 P.2d 501].) It is sufficient if the corroborative evidence strengthens and confirms the testimony of the party seeking a dissolution of the marriage. (*Hill* v. *Hill,* 106 Cal.App. 309, 312 [289 P. 227].)

The rule is, of course, settled in California that a separate maintenance decree is not a bar to a subsequent action for divorce upon grounds of cruelty committed subsequent to the final separation of the husband and wife. (*Cardinale* v. *Cardinale,* 8 Cal.2d 762, 768 [68 P.2d 351]; *Estate of McNeil,* 155 Cal. 333, 343 [100 P. 1086]; *Comfort* v. *Comfort,* 17 Cal.2d 736, 744 [112 P.2d 259].) Therefore, the separate maintenance decree in the present action was not a bar to the action for divorce upon the acts of cruelty relied on by plaintiff which occurred subsequent to entry of the decree of separate maintenance.

Second: *Did the trial court abuse its discretion in awarding the community property to plaintiff?*

*No.* The rule is established in California that in a divorce action where the decree is granted to a party upon the ground of extreme cruelty it is within the discretion of the trial court to award to the innocent spouse all of the community property. (*Marshall* v. *Marshall,* 196 Cal. 761, 765 [239 P. 36]; *Barham* v. *Barham,* 33 Cal.2d 416, 431 [202 P.2d 289]; *Crouch* v. *Crouch,* 63 Cal.App.2d 747, 756 [147 P.2d 678].) In the instant case there was no showing of an abuse of discretion and this court is bound by the finding of the trial court. (See *Meyer* v. *Meyer,* 184 Cal. 687, 689 [195 P. 387].)

Affirmed.

Moore, P. J., and Fox, J., concurred.