[Civ. No. 9205. Third Dist. July 3, 1958.]

EMPIRE REDWOOD COMPANY (a Corporation), Plaintiff and Appellant, v. S. J. HALL et al., Defendants and Appellants.

Preston, Falk & Johnson, and Harry W. Falk, Jr., for Plaintiff and Appellant.

Charles R. Bell, Mannon, Brazier & Bell, Walter Lowry, McCutchen, Thomas, Matthew, Griffiths & Greene, Kasch & Cook and Leo Cook for Defendants and Appellants.

SCHOTTKY, J.—In 1949 Empire Redwood Company (referred to hereafter as Empire) held a contract to purchase 26,000 acres of land and the timber thereon. On August 20th of that year Empire and S. J. Hall simultaneously executed several documents pertaining to the land and timber, all as part of one transaction. Empire assigned all of its rights in the purchase contract to Hall. He paid Empire $150,000 and agreed to pay the balance payable under the land purchase contract. Empire was given for a period of 25 years the exclusive right to log and manufacture all old growth timber located on the land. It was to pay Hall 10 per cent of the amount realized by it for redwood and pine lumber and 8 per cent of the amount realized for fir lumber. The tenth paragraph of the agreement also provided:

"It is recognized by the parties hereto that 25 years covers a long period of time, that the percentages of stumpage to sales value may change wtih the years and they agree that once in every five years in the life of this contract the question of percentage of sales for stumpage shall be revised by mutual agreement. If no agreement can be reached, the question shall be submitted to arbitration. . . ."

Empire conducted logging operations until 1953, at which time it leased its mill to Alvin M. Boldt and gave him the right to log the timber on the property. The agreement provided that Boldt would get "all the benefits and privileges" of the cutting contract between Empire and Hall.

In 1954 Hall, acting for Gualala Redwoods, a partnership which had succeeded to Hall's interest, hereinafter called Gualala, began correspondence with Empire regarding a revision of the stumpage-sale percentages. These negotiations failed to result in any agreement, and Hall then proposed

arbitration. Hall proposed that the arbitrators fix a revised percentage for the period August 20, 1954, to August 19, 1959, that is, for the second five-year period of the contract. Each party named one arbitrator, but were unable to agree on a third, and the proposed arbitration failed.

In October, 1954, Empire filed a complaint for declaratory relief. Boldt, who was named as a defendant, cross complained, as did Gualala. The cause was tried and the court entered a judgment from which all the parties have appealed.

The major question determined by the court was the new price to be paid Gualala for the timber. During the trial of this issue Empire sought to introduce parol evidence of the proceedings leading up to the execution of the documents to explain what the parties meant by the provision that "once in every five years in the life of this contract the question of percentage of sales for stumpage shall be revised. . . ." The trial court refused to accept parol evidence because the court did not believe the agreement was uncertain. The court ruled that Empire was attempting to vary the terms of an integrated agreement in violation of the parol evidence rule. The court said in its order for findings:

"The tenth paragraph of Exhibit 'B' provides 'that the percentages of stumpage to sales value may change with the years, and they agree that once in every five years in the life of this contract, the question of percentage of sales for stumpage shall be revised by mutual agreement.'

"When construed by itself, the meaning of this language is fairly discernible, and when provisions elsewhere in the contract are considered with it, the meaning is clear.

"In paragraph three of Exhibit 'B,' it is provided that 'the stumpage for said timber shall be 10% of the amount realized by the assignor for all redwood and pine lumber, and 8% of the amount realized by assignor for all fir lumber, F.O.B. mill, less discounts and selling commissions . . . calculated on the rough green price. . . .' If we let 'x' represent the stumpage price, and 'y' the lumber price, the proposition may be expressed algebraically as follows.

$$\frac{x}{y} = 10\% \text{ (In the case of redwood.)}$$

Using the same terms, the present problem is expressed as $\frac{x}{y} = z\%$. To determine the value of 'x,' the present values of 'X' and 'Y' are necessary."

In accordance with this construction the court took evidence of the present market value of stumpage and of lumber in order to determine the new percentage of sales which Empire was to pay Gualala until that percentage should again be revised.

■ The parties agree that the admissibility of parol evidence is governed by the rule, well stated in *Barham* v. *Barham*, 33 Cal.2d 416, 422 [202 P.2d 289] :

". . . When the language used is fairly susceptible to one of two constructions, extrinsic evidence may be considered, not to vary or modify the terms of the agreement but to aid the court in ascertaining the true intent of the parties [citation], . . . to show 'what they meant *by* what they said' [citation]. ■ Where any doubt exists as to the purport of the parties' dealings as expressed in the wording of their contract, the court may look to the circumstances surrounding its execution—including the object, nature and subject matter of the agreement."

We think that the language used in paragraph 10 is fairly susceptible of another construction. The contract differs from the usual stumpage contract. Gualala acquired the land and timber for a total cash outlay of about $400,000. Empire in turn reserved the right to cut and manufacture into lumber the old growth timber. Gualala was not to be paid a flat price for the timber removed. Rather, Gualala was given as its return a percentage of the price obtained by Empire for rough green lumber. The percentage payments to Gualala would result in a fluctuating return. As the price of green lumber increased Gualala's return would increase, and as the price of green lumber dropped Gualala's return would decrease. Gualala was sharing with Empire in the proceeds by receiving a percentage thereof. If the price of green lumber was $50 per thousand board feet and if there were 300,000,000 board feet of harvestable timber as estimated by the parties, then under the percentage fees agreed to Gualala would receive about $1,000,000 above its initial cash outlay. On the contrary, depressed lumber prices might seriously decrease Gualala's receipts. But being a part of Empire's total returns from harvesting, hauling, milling and selling, receipts would move to Gualala unless from economic shifts Empire would be driven to stop harvesting and go to the basis of minimum payments fixed at $17,500 a year.

According to the trial court's interpretation of the contract the parties intended to say that once in five years they would

arrive at a new percentage of sales to be paid Gualala and they would do this by ascertaining the market value of the remaining standing harvestable timber on the land involved, by ascertaining the existing price of lumber on the market and by then dividing the ascertained price of lumber into the ascertained market value of the timber, thus arriving mathematically at a new percentage of lumber prices which Empire would pay to Gualala from that time on until and unless a new revision was made. Carrying out this interpretation, the trial court limited the evidence to expert opinion testimony as to the existing market value of the remaining standing timber, conditions of terrain and contract harvesting conditions considered. Empire contends that this was the wrong approach and resulted in writing a new contract for the parties. It contends that the parties never intended periodically to ascertain market value of timber and lumber, but were concerned with an economic relationship between timber costs on the one hand and all other costs on the other, such as harvesting, hauling, milling and selling. It says and sought to prove that the parties negotiated the contract from the point of view that they anticipated a sharp rise in lumber prices over a considerable period of time, perhaps for the full life of the contract; that while Empire had purchased the timber at an advantageous price it had turned out that Empire was under-financed for the extensive operations involved, including such matters as the construction of access roads, this being a tract where favorable logging had been done for a very long time, including also shifting costs of operating a large mill. It says the parties considered that ordinary banking loans based on interest returns were proving unavailable and that resort must be had to what it terms equity financing, and that the parties were negotiating for and intended to agree upon something in the nature of a joint interest in the profits to be had from manufacturing that timber stand into lumber and selling the same, Empire to furnish the mill, the equipment and to stand all the direct expense of the operation, while Hall, predecessor to Gualala, was to advance immediately for Empire's existing needs the sum of $150,000, and to undertake to make the contract payments required under Empire's purchase contract. Empire sought, by proving the negotiations of the parties, to prove that such was the reason for the provision of the contract that Gualala's return should represent a percentage of lumber sales. It wanted to prove

also that the revision clause came into being at the close of negotiations upon the suggestion that the economic ratio or relationship between timber costs and all other costs might so shift that the initial sharing ratio would become unfair and unresponsive to their basic intent; that the parties discussed the possibility, not unknown to the industry, that new equipment and mechanical improvements in either the harvesting end or the milling end, and new changes in labor costs and labor supply, could upset the existing economic relationship so as to render the contemplated plan of sharing receipts unfair to one party or the other. It insisted in the trial court, and here insists, that the parties were concerned with these possibilities and that the parties did not fix upon the shares of each with reference to the then market value of the timber. In this connection Empire points to provisions in the contract as made wherein adjustments for overages or shortages in the estimated total stand of 300,000,000 board feet were based upon an agreed stumpage price of around $2.00, whereas, taking agreed percentages of lumber prices at that time, Gualala would receive approximately $6.00 per thousand board feet for the timber cut. Empire sought to prove that the suggestion of periodical revision was agreeable and that the attorney for Hall drafted the revision provision, attempting to express therein the wishes of the parties concerning revision; and that even the language used bears indications that Empire's contentions are valid. It says "percentages of stumpage to sales" refers to the economic relationship between the value of standing timber or its cost to a lumbering enterprise and all other costs. It points out that the word "percentage" means a ratio of one factor to another, expressed in hundreds or percentages. It says that the percentages initially fixed on for sharing the returns of the entire operation were intended to fix the share of each in the returns of the enterprise, not merely to state an existing ratio between timber value and all other costs. Their repeated requests that they be allowed to go into the negotiations between the parties were refused and the evidence was limited as above indicated.

The parties were equally in disagreement as to the interpretation of that portion of the tenth paragraph which provided for revision: ". . . once in every five years in the life of this contract . . ." This disagreement also is reflected in the trial court's order for findings, from which we quote: "It is Hall's contention that this figure [the revised percentages] is retroactive to August 20th, 1954 [that is, that it is to cover

the second five-year period of the life of the contract], while Empire contends that it becomes operative when the Judgment to be entered herein becomes final. The Court cannot concur with either of these views. The contract provides that the percentage shall be revised 'once in every five years in the life of this contract.' To give this language the meaning contended for by Hall, would require the substitution of the words 'at the end of' for the words 'once in,' every five years. When once determined, the percentages cannot again be reviewed during that quinquennium and will continue to the end thereof. Immediately thereafter, or at any time during the next five years, the prices may again be reviewed. The percentages to be fixed by the Judgment herein, shall be effective as of the entry of the Judgment, . . .''

■ With respect to the stated disagreements as to the proper interpretation of the contract it appears to us that a case is presented where under the stated rules the court was required to receive evidence concerning the circumstances under which and the negotiations by means of which the parties arrived at the written agreement which they executed.

There were other disagreements, but they were minor in comparison with those we have reviewed, and it is unnecessary to discuss them here since if the required evidence be taken they may be readily resolved. Distinct from, but related to, Empire's contentions as to interpretation is a contention advanced by it that the contract is invalid insofar as the percentage of sales that Gualala is to receive is concerned, the argument being that, aside from the processes of arbitration which the parties have turned away from, the contract affords the court no workable standard for a revision. But this contention, too, may very well be affected by the interpretation of the contract when it is arrived at by the use of parol testimony. As we see it, the only permissible order that can be made on appeal is an order reversing the judgment appealed from.

■ The only contention of Alvin M. Boldt which requires an answer is whether the trial court erred in determining that he was not a proper party to the litigation. Boldt as the lessee of Empire's mill and as the party who was actually doing the logging was an interested party since under his agreement with Empire his payments to it would increase as Empire's payments to Gualala would increase. He would be affected by the determination of the issues involved in the Empire-Gualala controversy and was a proper party to the action.

No other issues presented require determination by this court at this time.

The judgment is reversed. Appellants Empire Redwood Company and Boldt to recover costs on appeal.

Van Dyke, P. J., concurred.

On July 8, 1958, the opinion and judgment were modified to read as printed above. Petitions for a rehearing were denied August 1, 1958.