[Civ. No. 14098.   First Dist., Div. One.   Mar. 20, 1950.]

BEATRICE ALICE LaVIGNE, Respondent, v. EVERETT PHILLIP LaVIGNE, Appellant.

Albert Waldstein and Edmund J. Holl for Appellant.

John T. Rudden, Jr., for Respondent.

BRAY, J.—The superior court awarded plaintiff wife an interlocutory decree of divorce on the ground of extreme cruelty, and all of the community property, denying defendant husband's cross-complaint on the same ground. Defendant appealed.

### QUESTIONS PRESENTED

1. Insufficiency of the evidence. 2. Failure of the court to find upon the specific allegations of cruelty. 3. Abuse of discretion in awarding the community property.

1. *Evidence.*

The evidence was conflicting. Evidently the court believed the plaintiff and her corroborating witnesses. Our duty is to determine if their testimony substantially supported the court's finding that defendant was guilty of extreme cruelty. (*Oakley* v. *Oakley,* 82 Cal.App.2d 188 [185 P.2d 848].)

The parties were married in 1930 and separated in May, 1946. Plaintiff testified that, particularly the last two or three years before their separation, defendant treated her in a cool manner; many times told her he did not love her,

and when she asked him why he stayed with her if he did not love her, he replied that "he would always be sure of a clean body when he got me and he got it for nothing"; he struck her many times, kicked and choked her, and that in 1945 he had threatened to kill her; that he would curse her mother and talk about her; that he called her brother a "dumb cluck" and said he would not support her but wanted the brother to do so; that when she was operated on he went out celebrating; he could not be found for three days when his consent was necessary for her second operation; that he refused to pay the hospital and doctor bills, saying that "he didn't give a damn where I made the money"; that her brother and mother paid these bills; that he treated her very disrespectfully and showed no affection towards her; that his course of conduct had adversely affected her health.

A Mrs. Harman testified that during the married life of the LaVignes and particularly in the last three or four years, she had visited their home as often as once a week; that defendant during the last years was always surly and snappy towards his wife; "would never call her by name, but 'Get this,' and 'Get that,' or 'Do this.'" The witness asked defendant one day why he did not show his wife some affection and he said, "Oh, the hell with her, she's nothing but a cold potato"; that if plaintiff spoke when they were sitting at the table eating, defendant would tell her to "shut up"; that the way he spoke to plaintiff made plaintiff very nervous. One night they went to the neighborhood show and defendant would not walk or sit with her and plaintiff.

Witness Jones, brother of plaintiff, testified that defendant ordered plaintiff around—"get me this and get me that, wanted her to cater to him all the time," and that "He didn't seem to treat her very nice" and "She was very upset"; that after the separation defendant followed plaintiff on one occasion and on a street corner said to her, "I will get even with you another time" and "Give me all the money and I will give you a divorce."

Mrs. Santos testified that she lived in the same flat building as did plaintiff and defendant from 1935 to 1942 and that she was in and out of their home "like my own house"; that defendant used to quarrel and fight with plaintiff and "swear once in a while to her"; that he came home drunk sometimes and would say, " 'You go down to the corner and buy me some beer.' She used to go out, raining or pouring"; that defendant criticized plaintiff by saying, "I don't like

her," "You are too old for me"; that when he was drinking he suggested that the witness was young "and why I didn't go out with him." The witness called plaintiff on these occasions and told her to take defendant away and plaintiff would drag him out. The witness asked defendant, "Don't you like her?—she do everything for you, she clean and she cook for you and goes and buy everything for you: What more do you want?" and he answered, "Oh, I don't want any more, I got my blonde some place."

Defendant denied mistreating plaintiff in any way, claimed that he had always been a good husband to her and that she constantly nagged him and that she had the entire handling of the community money. Two sisters of defendant corroborated defendant's testimony.

Defendant contends, first, that the matters testified to by plaintiff do not justify a finding "that the defendant wrongfully inflicted upon the plaintiff grievous mental suffering" and secondly, that there is no corroboration of plaintiff's testimony. It is not necessary to discuss the first point, as a mere reading of plaintiff's testimony as herein outlined shows that the contention is not well founded. ■ As to the second point, it is important to bear in mind the rule in cases of this kind. " 'The extent of the corroboration necessary for the granting of a decree of divorce is not defined in any of our statutes. It is not necessary to corroborate all of the acts of cruelty charged by the party to whom the decree is granted. Where a number of charges of cruelty have been made, corroboration of a single act of cruelty may be sufficient. [Citations.] Moreover, the rule requiring corroboration is not so strictly applied in hotly contested divorce actions as it is in actions where a decree is demanded upon the default of the opposing party. The principal object of the corroboration rule is to prevent collusion between the parties, and where it is clear from the evidence in a contested action that there is no collusion the court is justified in granting the decree upon evidence which is only slightly corroborated if otherwise the court is satisfied that the prevailing party is entitled to a decree. [Citations.]' " (*McGann* v. *McGann,* 82 Cal.App. 2d 382, 386-7 [186 P.2d 424], quoting from *Serns* v. *Serns,* 70 Cal.App.2d 527 [161 P.2d 417].)

■ Plaintiff testified that defendant, among other things, had told her he did not love her, that he treated her very disrespectfully and showed no affection towards her. These matters were definitely corroborated by her witnesses as above

set forth. Such corroboration, under the rules above set forth, was sufficient even though the charges of striking plaintiff and other acts of cruelty were not corroborated, and even though the court stated, at the end of the case, "there is merit on both sides . . . both of them have not lived up to their marital obligations with reference to the treatment by each of the other. I think there has been undoubtedly nagging and unnecessary fault finding on both sides" and that he had decided "by a rather close margin" that plaintiff was entitled to the divorce.

2. *Findings.*

The court found "That it is true that the defendant wrongfully inflicted upon the plaintiff grievous mental suffering; that it is not true that the plaintiff was guilty of extreme cruelty against the defendant, as set forth in the cross-complaint of the defendant." It did not find on the specific charges of cruelty set forth in the complaint, which were as follows: "(a) That defendant has repeatedly told plaintiff he did not love her; (b) That defendant has repeatedly told plaintiff he would kill her; (c) That defendant has repeatedly told plaintiff she was not a good wife, because she refused to go out and work and support defendant; (d) That defendant has repeatedly insulted plaintiff's family and friends; (e) That defendant has, on many occasions, struck plaintiff; . . ." ■ The record shows that a copy of the findings was served upon defendant's counsel August 5, 1948. They were signed and filed on September 2. No counter findings were proposed, nor was any objection to the proposed findings made. No request for specific findings was made. Defendant contends that the judgment is void because of the failure of the court to make specific findings rather than the one of the ultimate fact of cruelty. That a finding of "grievous mental suffering" is a finding of an ultimate fact rather than being a conclusion of law was held in *LaMar* v. *LaMar,* 30 Cal.2d 898, 902 [186 P.2d 678], overruling earlier cases relied upon by defendant in this connection. Defendant cites many cases to the effect that specific findings are necessary in a divorce case. Some of the later of these are discussed in *LaMar* v. *LaMar, supra,* page 901, wherein it is pointed out that those cases were decided prior to the adoption in 1939 of section 426b of the Code of Civil Procedure which permits pleading extreme cruelty, in the absence of a demurrer, generally rather than specifically. While the LaMar case holds that the gen-

eral finding is all that is necessary, in the absence of objection, it is doubtful if it would support a general finding alone, were a request for specific findings made or the general finding objected to. The allegations of cruelty in the LaMar case were general and differ from the allegations in the complaint here in that respect. However, even prior to the enactment of section 426b the courts uniformly refused to reverse a divorce judgment for lack of specific findings where no such findings were requested nor objection made to the general finding. In *Del Ruth* v. *Del Ruth,* 75 Cal.App.2d 638 [171 P.2d 34] (cited by defendant), where the only finding was that the cross-defendant had wrongfully inflicted upon the cross-complainant "grievous mental suffering," the court said (pp. 644-645): "If special findings are requested, it would be error for the court to refuse them, but if no special findings are requested and no objection is made to a proposed general finding, the only objection to such general finding which can be raised later is that it is insufficient to support the judgment. The findings criticized were not mere conclusions of law; they were findings of ultimate fact and were sufficient to support the judgment. (*Ungemach* v. *Ungemach,* 61 Cal. App.2d 29, 40 [142 P.2d 99].) Plaintiff had an opportunity to object to the general findings and to demand special findings. Section 634 of the Code of Civil Procedure requires that proposed findings be served and that no findings be signed until the expiration of 5 days after such service. The purpose of the requirement is to afford the opposing party an opportunity to object to the form or substance of the proposed findings and to propose other findings. The opportunity thus afforded gives rise to a duty to make objection, and if none be made, the right to object must be deemed to have been waived. . . . In divorce cases findings may be waived by the parties as in other cases. (*Waldecker* v. *Waldecker,* 178 Cal. 566 [174 P. 36].) If there may be a valid waiver of findings, there may be a valid waiver of special findings, and we think that here the findings of cruelty may not be questioned on appeal on the ground of error because they were not specific. The general rule is stated in 2 California Jurisprudence, page 248, section 74: 'It is a well settled rule that a party cannot urge, for the first time on appeal, objections which could have been obviated if made in the court below. This doctrine is founded partly upon a sort of estoppel, for where the objection is one which could, if made in the court below, have been obviated, it would be clearly unjust for a party to withhold

his objection until his appeal, when it is too late to correct the defect.' "

3. *Community Property.*

The court found that at the time of separation there was cash and bonds totaling $13,100; that of this sum $3,050 was the separate property of plaintiff, and the balance of $10,050 was community property; that most of the furniture was plaintiff's personal property, only a small portion being community property. In the interlocutory decree of divorce the court ordered, in addition to plaintiff receiving the said $3,050 and certain furniture as her separate property, that all of the community property, namely, $10,050 and the balance of the furniture, be awarded to plaintiff. It further ordered that plaintiff charge the portion of said $10,050 which was in the bank (approximately $8,900) "with all alimony payments now due herein to plaintiff from defendant, as well as the attorney fees and costs heretofore and now ordered paid"; that defendant pay plaintiff $75 per month as alimony until the further order of the court, $400 attorney's fees in addition to $100 theretofore awarded, and court costs.

On motion for new trial, the court modified the interlocutory decree by reducing the alimony from $75 to $5.00 per month until the further order of the court, "with leave to the plaintiff, if her needs make it necessary so to do, to petition this court for an increase in the amount of said alimony a reasonable time prior to the exhaustion of her separate funds and the exhaustion of the community funds awarded to her by this decree." In making said modification the court filed a "Memorandum Opinion on Motion for a New Trial" in which it stated: "As I mentioned on the argument of the motion for a new trial, having awarded the plaintiff a divorce on the ground of the defendant's cruelty, I am impliedly required to award her more than one-half of the community assets, the proportion to depend on the particular circumstances of the case. *Crouch* v. *Crouch,* 63 Cal.App.2d 747, 756 [147 P.2d 678]. This apportionment of the community property that I must make to the wife is one to which she is entitled as of right. In addition the defendant is under the obligation to pay the plaintiff alimony. The theory underlying this requirement is that the husband entered into an obligation which bound him to support his wife during the period of their joint lives, and that 'by his own wrong he forced her to sever the relation which enabled her to compel

the performance of this duty, and that he is required to make compensation for the offense committed by him which has deprived her of the benefit of the obligation.' *Arnold* v. *Arnold,* 76 Cal.App.2d 877, 886 [174 P.2d 674].

''The defendant's conduct in wholly disregarding the order of this court made in May, 1946, which sum then ordered to be paid approximated approximately $3600 up to the time of the entry of the interlocutory decree, indicated to me that he would probably disregard any order that I might make for the payment of alimony unless forced to comply by contempt proceedings. I therefore concluded that the simplest method of assuring the wife's support was to award her all of the community property, which I did. The alternative open to me would have been to award the plaintiff a portion of the community property and then to impress a lien on the defendant's portion as security for the payment of the alimony awarded. The ultimate effect would have been the same. . . .

''I may also add that in considering the proper apportionment of the community property, it should be borne in mind that the defendant admitted that since he separated from his wife in May, 1946, he had earned approximately $3,000.00, which of course was community property, and that he had given his wife no part of this sum.''

Defendant contends that in awarding plaintiff the entire community property the court abused its discretion, particularly as the court had stated, as above set forth, that by a ''rather close margin'' it had decided that plaintiff was entitled to the divorce. As said in *Barham* v. *Barham,* 33 Cal. 2d 416, 431 [202 P.2d 289] : ''The divorce having been granted to plaintiff on the ground of defendant's extreme cruelty, it was within the discretion of the trial court to award her as the innocent spouse all of the community property. [Citations.]''

In view of the situation of the parties and the reasons given by the court for awarding plaintiff all of the community property, including the reduction of the amount of alimony to be paid, we cannot say that the court abused its discretion.

Defendant criticizes the court's order to the effect that when plaintiff's funds near the exhaustion point she may petition for an increase of alimony, on the ground that this gives her ''carte blanche'' to dissipate her funds and then seek alimony. The obvious answer to this contention is that if and when plaintiff seeks an increase in alimony, the court

will undoubtedly inquire into the diminution of her funds to determine whether or not she has dissipated them.

Defendant points to section 148 of the Civil Code, which permits a reviewing court to revise the community property award of a trial court, even though the latter's action is discretionary, and asks that we exercise such power here. While we are not concluded by the determination of the trial court, we do not deem this a case in which we should revise its award, particularly in view of the fact, as stated in the court's memorandum, that defendant at the time of the interlocutory decree had not complied with the court's previous order and was in arrears in alimony approximately $3,600. The court allowed plaintiff an additional $400 attorney's fee. Adding this to the $3,600 made $4,000 due to plaintiff from the defendant. This the court ordered paid out of the community $10,050, leaving a balance of $6,050, or only $1,025 more than one-half of all the community property, except the furniture. The court's finding "that *some small part thereof* [the furniture] is community property" (emphasis added), is not challenged. Such an award is not excessive.

The judgment and decree is affirmed.

Peters, P. J., and Schottky, J. pro tem., concurred.

Appellant's petition for a hearing by the Supreme Court was denied May 18, 1950. Carter, J., and Schauer, J., voted for a hearing.