[Civ. No. 16492. First Dist., Div. One. Aug. 15, 1955.]

ALOHA R. JONES, Respondent, v. EARLE L. JONES, Appellant.

Robert H. Kroninger for Appellant.

Suren Toomajian for Respondent.

PETERS, P. J.—This action was brought for a divorce. The husband answered and cross-complained. The trial court granted the interlocutory decree to the wife on the ground of cruelty, found certain specified property to be the community property of the parties and divided it between them, and awarded the wife $175 per month alimony and $300 attorney's fees. The husband appeals, challenging each major ruling made by the trial court.

The parties were married in April of 1939 and separated in August of 1953. There are no children. In addition to testifying that during the last couple of years the parties had lived together the appellant had become critical and cold, that he had, on occasion, called her vile names, and had struck her several times, respondent described, in some detail, a brutal beating inflicted upon her by her husband on the night of August 2-3, 1953. August 2d was a Sunday, a day on which respondent worked as a drug clerk from 10 a. m. to 6 p. m. She testified that she arrived home at about 6:15 p. m. and found appellant working on some lodge papers for her benefit; that she had a mild argument over appellant's failure to have dinner prepared; that she then had one drink at appellant's request; that at dinner a jacket on a tooth broke which upset her because she had several lodge appearances to make; that she started to cry; that appellant became abusive and ridiculed her, whereupon she decided to go to bed; that at about 9:30 p. m. appellant came into the bedroom, grabbed her by the hair and struck her, and then left the room; that shortly after midnight she heard a commotion downstairs, and heard her husband calling; that she came downstairs and found him

holding the neck of a broken whiskey bottle in his hand advancing toward her in a threatening fashion; that she threw a plant and ash tray at her husband and ran from the room; that appellant caught her and brutally beat her, later telling her that he hated her. The next morning respondent went to the home of her friend, Mrs. Angle, and was treated three times by a physician for her many bruises, contusions and sprains. It took several weeks for her to recuperate. Respondent testified that she had not seen her husband drinking that day or night, but concluded he had been drinking from the way he acted.

The only corroboration of this testimony proffered by respondent was through the testimony of Mrs. Angle. This witness testified that she came to the home of respondent about 9 a. m. on August 3, 1953, and found respondent in a state of shock; that respondent was then badly bruised and very nervous; that she took respondent to her home and called a doctor; that she cared for respondent until she recuperated from the beating; that respondent had told her how she had received the bruises and, in particular, had said that she had received a bruise on her back caused when "Earle had pulled her bra off."

Appellant denied this story, testifying that respondent was frequently drunk; had become drunk on the night in question when she drank most of a fifth of whiskey; had tripped over a telephone cord and fallen down the stairs; had refused his offer to call a doctor; had become abusive; had thrown the flower pot and ash tray at him; had wanted some more to drink, whereupon he broke the whiskey bottle to prevent her from drinking any more, and had forcefully put her to bed. In corroboration of this story he produced a witness, a lodge acquaintance of his wife, who testified that early in August of 1953 respondent had telephoned her and told her that she, respondent, could not attend a lodge function because she had tripped over the telephone cord, fallen down the stairs, and received serious bruises. But this witness also testified that later the same month, after the witness had been subpoenaed to testify at a preliminary hearing, respondent told her that this story was not true, that her husband had beaten her, and that she had told the witness a false story because she was embarrassed in having the lodge members learn about the family discord.

Appellant first attacks the testimony of respondent on the ground that it is incredible and unworthy of belief. ■ It

is true that an appellate court is not bound by the testimony of witnesses that "cannot by any possibility be true, or when their testimony is inherently impossible" (*Austin* v. *Newton,* 46 Cal.App. 493, 497 [189 P. 471], but, as that and many other cases have pointed out, normally the weight of the evidence is for the trier of the fact, and the appellate court can upset a finding based on evidence only when the supporting evidence is incredible. (See *Neilson* v. *Houle,* 200 Cal. 726 [254 P. 891] ; *Estate of Jepson,* 178 Cal. 257 [172 P. 1107].) We cannot say that the testimony of respondent is inherently incredible.

Appellant next contends that respondent was impeached by the testimony of the lodge friend who testified that respondent had told her that she had been bruised when she fell down the stairs after tripping over a telephone cord. But the trial judge must have believed the explanation offered to the witness a short time later, to the effect that she had told this story because she was embarrassed to have her lodge friends learn of the true facts about her domestic difficulties. This explanation is certainly not incredible. Its sufficiency was a trial court problem.

The only substantial question presented on this phase of the case is whether the testimony of respondent was sufficiently corroborated to comply with the requirements of section 130 of the Civil Code. (See also Code Civ. Proc., § 1839.) There are many cases interpreting and applying section 130.

In *Ungemach* v. *Ungemach,* 61 Cal.App.2d 29, 34 [142 P.2d 99], this court stated: "It is true that some of the charges made by the respondent were not corroborated, but this is not required under the law of this state. A single act of cruelty, if corroborated . . . is sufficient. [Citation.] It is not required that the evidence be corroborated as to every fact and circumstance appearing in the record. If there is corroborative evidence of one or more facts which is, or are, sufficient to show cruelty, that is sufficient. [Citation.]" (See also *Cooper* v. *Cooper,* 88 Cal. 45 [25 P. 1062] ; *Andrews* v. *Andrews,* 120 Cal. 184 [52 P. 298] ; *Crum* v. *Crum,* 57 Cal. App. 539 [207 P. 506] ; *Percy* v. *Percy,* 188 Cal. 765 [207 P. 369] ; *Avery* v. *Avery,* 148 Cal. 239 [82 P. 967] ; *Blanchard* v. *Blanchard,* 10 Cal.App. 203 [101 P. 536].) The corroboration may be by direct or circumstantial evidence. (*Thoele* v. *Thoele,* 102 Cal.App. 387 [282 P. 1001] ; *Andrews* v. *Andrews,* 120 Cal. 184 [52 P. 298].)

It is also well settled that the main purpose of the rule

requiring corroboration "is to prevent collusion. In a case which is hotly contested, as the one here involved, it is obvious that no collusion existed. In such a case the corroboration required is slight and its sufficiency is largely for the trial court." (*Ungemach* v. *Ungemach,* 61 Cal.App.2d 29, 36 [142 P.2d 99] ; see also *Wilson* v. *Wilson,* 124 Cal.App. 655 [13 P.2d 376] ; *Keller* v. *Keller,* 132 Cal.App. 343 [22 P.2d 798] ; *LaVigne* v. *LaVigne,* 96 Cal.App.2d 531 [216 P.2d 75] ; *Serns* v. *Serns,* 70 Cal.App.2d 527 [161 P.2d 417] ; *Hellman* v. *Hellman,* 108 Cal.App.2d 588 [239 P.2d 458].)

In *Price* v. *Price,* 71 Cal.App.2d 734 [163 P.2d 501], the corroborating witness testified that she had heard defendant threaten to strike the plaintiff, and had seen marks and bruises on plaintiff which plaintiff had told her were caused by defendant. In holding this evidence sufficiently corroborative it was stated (p. 736) :

"This testimony constituted sufficient corroboration of plaintiff's testimony as to defendant's cruelty in view of the established law in California that if there is corroborative evidence of one or more facts showing cruelty, such evidence is sufficient to satisfy the requirements of section 130 of the Civil Code. [Citation.]

"It is also to be noted that in such a case as the present, where the action is contested and it is apparent that no collusion exists, the corroboration required is slight, and its sufficiency is largely for the determination of the trial judge."

A case closely in point is *Dowd* v. *Dowd,* 111 Cal.App.2d 760 [245 P.2d 339]. There a friend of the plaintiff testified that she had seen the defendant drunk on two occasions and had seen bruises on plaintiff that the latter had told her had been inflicted by the defendant. Except as to the fact of drunkenness the case is very similar to the one here involved. This court held the corroboration sufficient, stating (p. 763) :

". . . Mrs. Quinn's testimony as to the results of blows and her statement that she had seen the defendant while in a state of intoxication is some corroboration, though slight.

"The existence of corroboration of material facts given in evidence by the respondent is, of course, a question of fact. The sufficiency of the corroboration should be determined in the light of the purpose of the requirement for corroboration, the prevention of collusion. That, too, presents a question of fact. 'The principal object of the corroboration rule is to prevent collusion between the parties, and where it is clear from the evidence in a contested action that there is no col-

lusion, the court is justified in granting the decree upon evidence which is only slightly corroborative if otherwise the court is satisfied that the prevailing party is entitled to a decree.' (*Tompkins* v. *Tompkins*, 83 Cal.App.2d 71, 76 [187 P.2d 840].)''

In the instant case Mrs. Angle testified that on the morning of August 3d she saw the physical marks of brutality on the body of respondent, and was told by respondent how these bruises had been inflicted. Even if this was hearsay it came in without objection; in fact, the testimony about the bruise caused by appellant pulling the bra off of respondent came into the record as a result of questions asked of Mrs. Angle on cross-examination. ■ Unobjected to hearsay is, of course, sufficient to establish a fact. (See cases collected 19 Cal.Jur.2d 238, § 474; see also *Keim* v. *D. B. Berelson & Co.*, 105 Cal.App.2d 154, 163 [233 P.2d 123]; *Baley* v. *J. F. Hink & Son*, 133 Cal.App.2d 102, 109, 110 [283 P.2d 349].)

Tested by these standards the corroboration, although slight, is legally sufficient.

The appellant next challenges the sufficiency of the evidence to support the findings in reference to community property. The trial court found that an equity in a piece of property referred to as the Taurus Avenue property, its furnishings, a Buick and a Ford, and a promissory note on which $11,044.32 was due and which was pledged to secure an indebtedness of the parties in the sum of about $1,500, were community property. The trial court awarded the Taurus Avenue property, the furniture, and the 1934 Ford to respondent, and awarded appellant a 1949 Buick, the promissory note and certain tools and photographic equipment. It is these findings that are challenged by appellant.

It is not disputed that appellant owned a substantial estate before his marriage to respondent, and that their present acquisitions can be traced to this original separate property. It is also not disputed that most of the properties at the time of trial were held in joint tenancy. It is respondent's position that the properties found by the trial court to be community were in fact converted into community property by agreement of the parties. It is our conclusion that the findings of the trial court on this subject are supported.

Prior to his marriage appellant owned a ranch in Mendocino County. In 1938 he exchanged it for an equity of $22,500 in the Hopkins Court Apartments, assuming two mortgages totalling $27,500. In April of 1939 appellant and respondent

were married. Thereafter, respondent helped to manage the apartment house. After marriage the two mortgages were refinanced, the refinancing agreement being signed by both appellant and respondent.

In October of 1944 the apartment house was sold, $24,528.16 in cash being received on the deal. The check for this was made out to both parties, and deposited in appellant's account. With $6,000 of this money the Norton Avenue property was purchased, title being taken in joint tenancy, and two mortgages assumed which were subsequently paid off with some of the proceeds of the sale of the apartment house. Paid for from the same source were $8,500 in improvements. Subsequently, the Norton Avenue property was sold for $14,600, the sellers taking back a note payable to both parties for $11,900. This note was later pledged to the bank to secure a loan of $2,000. This note was found to be community property and awarded to appellant.

With the cash portion of the proceeds of the Norton Avenue sale, which were paid to both parties, they purchased the Taurus Avenue property, title being taken in joint tenancy and both assuming the obligation of an outstanding deed of trust. At the time of trial there was due on this deed of trust $7,414.93, and the equity, found to be community property and awarded to respondent, was somewhere between $1,500 and $6,000.

The Buick was purchased with money realized from the sale of the apartment and was in appellant's name. Admittedly, appellant had made a gift of the Ford to respondent. Appellant was employed a major portion of his married life, and where this income, admittedly community, went, is not clear from the record. Respondent testified that, as to all of the properties, she had managed them and had personally done much of the maintenance work because her husband's job required him to be away from their home on many occasions. It was she who first decided to sell the apartment house and the Norton Avenue properties.

Appellant testified that in all of the transactions in which his wife joined or was named as a joint tenant, the form of the transaction was forced upon him against his will by the banks, title companies, or other parties to the transactions; that he told several of these agencies, in the presence of his wife, that he wanted to keep his property separate, but they nevertheless insisted on the joint tenancy form, and that prior to marriage he and respondent orally agreed, because of an unfortunate

prior marital experience he had had, that all of his separate property was to remain separate after marriage.

Respondent testified, however, that the property found by the trial court to be community was in fact community because of a post marriage understanding she had with her husband; that she had never agreed that the property was to remain separate, and never heard appellant so state. When asked if there had been any agreement with appellant when the various properties were purchased after marriage respondent replied: "It was always a half and half possession, we were partners, we called ourselves partners." When asked if she understood the meaning of the words "joint tenancy," she replied: "Well, I assume that it is a fifty-fifty proposition of community property, that is what I understand it." Admittedly, the parties filed joint income tax returns all during their married life. This latter fact is entitled to some weight in determining the nature of the property from which the income was earned. (*Estate of Raphael*, 91 Cal.App.2d 931 [206 P.2d 391].)

There can be but little doubt that the evidence would clearly support a finding that the properties involved were held in joint tenancy. The form of the title deeds raised a rebuttable presumption that the property was in fact held in joint tenancy, and placed the burden on the party claiming it to be community or separate to prove that fact. (*King* v. *King*, 107 Cal.App.2d 257 [236 P.2d 912] ; *Delanoy* v. *Delanoy*, 216 Cal. 23 [13 P.2d 513] ; *Tomaier* v. *Tomaier*, 23 Cal.2d 754 [146 P.2d 905] ; *Walker* v. *Walker*, 108 Cal.App.2d 605 [239 P.2d 106] ; *In re Rauer's Collection Co.*, 87 Cal.App.2d 248 [196 P.2d 803] ; *Edwards* v. *Deitrich*, 118 Cal.App.2d 254 [257 P.2d 750].) There is evidence that would support a finding that the property remained separate, in spite of the form of the deeds. This evidence was contradicted and disbelieved by the trial court. The real question is whether there is sufficient evidence to support the finding that the property was community. It is now too well settled to require extended discussion that, even though the deeds to property are in joint tenancy, a husband or wife can testify to an oral agreement to hold the property as community, and if the testimony is believed such evidence will support a finding that the property is community. (*LaMar* v. *LaMar*, 30 Cal. 2d 898 [186 P.2d 678] ; *Tomaier* v. *Tomaier*, 23 Cal.2d 754 [146 P.2d 905] ; see cases collected 10 Cal.Jur.2d 731, § 56 et seq.) One of the most recent cases dealing with this problem is

*Linville* v. *Linville,* 132 Cal.App.2d 800 [283 P.2d 34]. There the problem involved was whether the evidence supported a finding that certain property was community, the property admittedly having once been separate property of the husband, and the evidence that it was intended to be community being all oral. Starting at page 959 the following appears:

"It is first urged that the evidence fails to establish an oral agreement transmuting appellant's separate funds into community property. In other words, that the finding respecting such agreement is not supported by the record.

" 'In disposing of such a contention, this court's power begins and ends with a determination as to whether there is any substantial evidence to support the findings.' (*Estate of Raphael,* 91 Cal.App.2d 931, 936 [206 P.2d 391]) . . .

"Whether the statements of respondent and the conduct of appellant indicated an intent on the part of the latter to transmute his separate property into a community interest with respondent was a question for the trier of fact. [Citations.]

"As stated in *Estate of Raphael,* 91 Cal.App.2d 931, 939 [206 P.2d 391] : 'All that is required to show an executed oral agreement of transmutation is proof of the parties' acts and conduct in dealing with their property . . . The object of the oral agreement of transmutation was fully performed when the agreement was made for it immediately transmuted and converted the separate property of each spouse into community property and nothing further remained to be done.'

"In the cited case, the widow Raphael testified that decedent told her 'we were partners . . . and we had to file taxes, and he said that everything he had was mine, and everything I had was his; that we were partners in everything, and everything was fifty-fifty.' . . .

"And as stated in *Estate of Sill,* 121 Cal.App. 202, 204 [9 P.2d 243] :

" 'It clearly appears . . . that the agreement or understanding between the parties is not required to be in any particular words and need not be attended with any particular formality as long as it may be fairly inferred from all of the circumstances in evidence that a community interest was intended by the parties.' "

It will be noted that in the instant case the evidence as to the oral agreement was very similar to that in *Estate of Raphael,* referred to in the Linville case, and, as in the Raphael case, the parties filed joint income tax returns. For these

reasons it must be held that the findings as to community property are supported.

Appellant next attacks the finding ''That defendant should pay to plaintiff as and for her support and maintenance and alimony the sum of One Hundred Seventy Five Dollars ($175.) per month'' as being insufficient because the court did not find the husband's ability to pay or the wife's needs. The finding is sufficient. ■ While it is true that the court must make findings on all material issues in a divorce case as in other cases, and that the determination of alimony is a question of fact, the trial court is only required to find ultimate facts and is not required to find probative facts. In *LaMar* v. *LaMar*, 30 Cal.2d 898, 900 [186 P.2d 678], it was stated to be the rule that in divorce cases the duty to make findings ''is to find ultimate rather than probative or evidentiary facts. ■ Findings of ultimate facts are controlling unless drawn as conclusions from findings of probative facts that do not support them. [Citations.]'' ■ The circumstances of the parties—i.e., the husband's ability to pay and the wife's needs—are merely probative of the ultimate fact of alimony. This was clearly inferred if not directly held in *Hall* v. *Hall*, 42 Cal.2d 435 [267 P.2d 249]. The finding was sufficient.

■ That the finding is amply supported is apparent. Respondent has part time employment as a drug clerk, earning about $100 a month. She has expenses, including a payment of $79.50 on her house, of about $289 per month. Appellant has a steady job earning him, before taxes, $5,300 a year, or a little more than $425 a month. In addition, he has a net income from the deed of trust of $46.50 per month. After payment of the $175 alimony, appellant, before taxes, will have an income of about $300 per month. He claims that his expenses are $320 per month. Under these circumstances the finding is supported. ■ As was said in *Hall* v. *Hall*, 42 Cal.2d 435, 442 [267 P.2d 249] : ''The principles which the trial judge must apply in awarding alimony are few and necessarily general in nature. An allowance for support must be made 'having regard for the circumstances of the respective parties.' (Civ. Code, § 139.) In making that award the trial court has a wide discretion. [Citation.] 'Circumstances' includes 'practically everything which has a legitimate bearing upon the present and prospective matters relating to the lives of both parties.' (*Lamborn* v. *Lamborn*, 80 Cal.App. 494, 499 [251 P. 943].) 'It refers to the needs of the parties and the

abilities of the parties to meet such needs; and in measuring such circumstances, consideration should be given to property owned and obligations to be met as well as to ability to earn and actual earnings.' (*Becker* v. *Becker,* 64 Cal.App.2d 239, 242 [148 P.2d 381].)''

 The trial court also made a finding that appellant should pay respondent's attorney $300 ''as and for additional attorney's fees . . . forthwith.'' Appellant charges that this is neither a finding nor conclusion, and that to support such an award there must be evidence produced and findings made. Neither appears here, according to appellant. The error in appellant's reasoning is that this finding is one of ultimate fact similar to the one in reference to alimony. Direct evidence of the reasonable value of the attorney's fee did not have to be introduced. Evidence as to such reasonable value of the services is necessarily before the trial court when it hears a case. The trial judge, being a lawyer, can readily ascertain from the presentation of the case the approximate time spent in preparation and trial, and the relative financial circumstances of the parties. The reasonableness of the fee awarded is, of course, a question of fact. (*Hardy* v. *Hardy,* 117 Cal.App.2d 86 [255 P.2d 85].) The trial court has a wide discretion in fixing the fee (*Smith* v. *Smith,* 85 Cal.App.2d 428 [193 P.2d 56] ; *Hardy* v. *Hardy,* 117 Cal.App.2d 86 [255 P.2d 85] ), which can be upset only for an abuse of discretion. No abuse here appears.

The judgment appealed from is affirmed.

Bray, J., and Wood (Fred B.), J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied October 13, 1955.